## NEWMAN v. SAMUELS *et al.*

I. Per LOWE, J., COLE, J., concurring.

1. **Deed of trust:** MORTGAGE IN EQUITY. In equity a conveyance of land to a trustee as security for the payment of a debt, with power to sell in default of payment, is treated as a mortgage.

Newman v. Samuels.

2. —— ABSOLUTE CONVEYANCE IN TRUST. There is a distinction between a deed conveying property in trust to secure the payment of a debt, and a deed making an absolute conveyance to a trustee for the purpose of raising a fund to pay debts.

3. —— APPLICATION OF PROCEEDS. A purchaser from a trustee who holds the title under an absolute conveyance, with a power to raise a fund for a specific purpose, must see that the trust fund is duly applied before he can receive a perfect title; while a purchaser from a trustee who holds under a conveyance of the property in trust to secure the payment of a specific debt, with power to sell in case of a default in making such payment, takes the property discharged of the former lien, and subject to no contingencies arising from the bad faith of the trustee in the application of the funds.

## II. Per LOWE, J., WRIGHT, Ch. J. and DILLON and COLE, JJ., expressing no opinion.

4. —— SATISFACTION AND DISCHARGE OF TRUST DEED. In 1852, D. executed to N. his note and deed of trust to secure the payment of the same, in which S. was named as trustee. In 1855, after the maturity of the note, D. died. In 1856, his administrator, pursuant to authority received from the County Court, sold the property described in the trust deed to L. Pending the negotiations, and before the conveyance,' *S. received the note secured from N., with authority, as his attorney, to take the necessary steps in the County Court to secure its allowance and payment as a claim against the estate of D., and did procure its allowance by said court as a claim against said estate.* On the day the property was conveyed to L., under the order of the court, S., acting as trustee and attorney for said N., by his deed to L., acknowledged the payment of the trust debt and conveyed the property to L. *Held,* That under the circumstances, the acknowledgment by S. that the trust deed was paid and satisfied was binding on N.

5. —— ESTOPPEL. When the creditor assents to a sale of the property described in a deed of trust executed to secure the payment of his demand, and to a diversion of the proceeds arising from the sale to other purposes than the payment of his debt, he thereby waives his lien, and estops himself from thereafter asserting it against the purchaser.

## III. Per LOWE and DILLON, JJ., WRIGHT, Ch. J. and COLE, J., concurring.

6. Recording act: ACKNOWLEDGMENT. The omission of the word "voluntary," or its equivalent, in a certificate of acknowledgment of the execution of a written instrument, conveying real estate, is a fatal defect in such certificate; and the record of an instrument, the certificate of the

acknowledgment of which is thus defective, does not impart constructive notice to a subsequent purchaser, though the defect was corrected by the recorder in the recorded copy.

7. —— STATUTE CONSTRUED. The provisions of chapter 30 of the acts of 1858, are invalid as to cases in which their application would interfere as to rights vested at the date of its taking effect.

8. —— CURATIVE ACTS. The rule is, that when a purchaser has paid for land, and the prior owner is under a moral obligation to convey, the legislature may cure a defective conveyance by retroactive legislation, as against such owner, his heirs and widow, but such legislation cannot affect the title of a subsequent *bona fide* purchaser.

9. Notice: RECITAL IN A DEED. T. and W. bought certain real estate of L., and received a deed of conveyance, in which reference was made to another deed executed by one S. to L., in which it was recited that a former incumbrance on said property had been paid and discharged, and the evidence showed that the incumbrance was a deed of trust, executed by D., the grantor of L., for the benefit of one N., and that said S. was the trustee named in said deed, and was acting as such when his deed to L. was executed. *Held*, That T. and W., acting in good faith, had a right to rely upon the entire recital in the deed of S. to L., and were not charged with notice of the existence of the incumbrance referred to therein as a subsisting lien.

*Appeal from Dubuque District Court.*

TUESDAY, DECEMBER 13.

THIS case is equitable in its character, and has its foundation in the following facts:

In June, 1852, J. J. Dyer, then in life, and a resident of Iowa, borrowed of the complainant, who, at that time, was, and still is, a resident of Virginia, $8,100; gave his note therefor, running three years, with ten per cent interest, payable annually, secured by mortgage with power of sale, usually termed a deed of trust; the respondent, Samuels, being the trustee.[1] In September, 1855, a short time after

---

[1] The following is a copy of the instrument referred to:

For the purpose of securing to Anderson M. Newman, of the county of Pendleton and State of Virginia, the sum of eight thousand and one hundred dollars with interest from date, at the rate of ten per cent per annum,

the maturity of the note and deed of trust aforesaid, the said Dyer departed this life. One F. V. Goodrich was appointed his administrator. In 1856, the said Goodrich, under authority derived from the County Court, made a sale of the mortgaged premises, being lot 468, in the city of Dubuque, to the respondent Langworthy, for the sum of $16,000, the deed bearing date July 22d, 1856, but not delivered, nor the sale aforesaid consummated until the November following. On the day of which the deed aforesaid bears date, Samuels, the trustee, by his deed to said Langworthy, acknowledged the payment in full of said trust debt, and conveyed said lot to Langworthy. This deed was not acknowledged and delivered until the 26th of November thereafter.[2]

---

said interest to be paid annually, on the 24th day of June, in the city of New York, Philadelphia or Baltimore, we, John J. Dyer, and Lucy W. Dyer, his wife, hereby convey to Benjamin M. Samuels, lot known on the city plat of Dubuque as lot No. 468, with its appurtenances, being the same on which said Dyer now resides,—and if the sum so secured to Anderson M. Newman is not paid by him by the 24th day of June, 1855, we hereby authorize the said Ben. M. Samuels to sell the property herein conveyed, after having advertised the time and place of sale in some newspaper published in the city of Dubuque, for at least two months previous to sale, to execute a deed to the purchaser to pay off the amount herein secured with interest and costs, and to hold the remainder subject to our order.

Witness our hand and seals this 24th day of June, 1852.

[L. S.]                               J. J. DYER,
[L. S.]                              LUCY W. DYER.

[Recorded in Book No. 3, page 125.]

STATE OF IOWA,       }
   *Dubuque County,*  } ss.

Be it remembered, that on this 24th day of June, 1852, before me, William Y. Lovell, County Judge of Dubuque County, in person came John J. Dyer and Lucy W. Dyer to me, personally known to be the persons whose names are subscribed to the foregoing Deed of Trust as parties thereto, and acknowledged the same to be their act and deed for the purposes therein named.

WILLIAM Y. LOVELL, *County Judge.*

[2] The following is a copy of the instrument:

Know all men by these presents, that whereas, John J. Dyer, of Dubuque, Iowa, for the purpose of securing Anderson M. Newman, of Pendleton county, Virginia, the sum of eighty-one hundred dollars, did on the

In August, 1857, Langworthy sold the same property to the respondents, Tuttle and the Wakefields, for the consideration of $20,000, making a warranty deed therefor. Two years or more after the sale of said trust property to Langworthy, and the cancellation of the deed of trust by Samuels, the trustee, namely, in January, 1859, the complainant, Newman, commenced this his proceeding in chancery, setting up that his debt aforesaid was unpaid, asking the setting aside of the conveyance to Langworthy and his grantees, and the foreclosure and sale of the trust property, the removal of Samuels, and the appointment of another trustee; charging upon the defendants fraudulent combinations, especially that Samuels had canceled the deed of trust without authority, in fraud of complainant's rights, who had received no part of the trust debt, and praying general relief, &c.

The defendants, besides denying these charges, or such of them as are material to the controversy, one of them, namely, James L. Langworthy, had filed his cross-

---

24th day of June, 1852, convey to me, Benjamin M. Samuels, of the city of Dubuque, Iowa, in trust, the following parcel of land situated in the city and county of Dubuque, in the State of Iowa, viz.: The northerly one hundred and forty one (141) feet of lot numbered four hundred and sixty-eight, as shown by the map of the survey of the town of Dubuque by the United States; and whereas, the said sum of eighty-one hundred dollars with interest thereon, in full, has been paid to the said Anderson M. Newman, and the said trust fully satisfied; and whereas, E. V. Goodrich, administrator of the estate of said John J. Dyer, acting under the authority of the County Court of said Dubuque county, has sold and thus conveyed said premises to James L. Langworthy, of Dubuque, Iowa, now, therefore, I, said Benjamin M. Samuels, trustee as aforesaid, do hereby convey to said James L. Langworthy, the part of said lot above described.

Given under my hand at Dubuque, Iowa, this 22d day of July, A. D. 1856.

BEN. M. SAMUELS, *Trustee.*

STATE OF IOWA, }
   *Dubuque County.* }

On this 26th day of November, A. D. 1856, before me, a notary public in and for said county, personally came Benjamin M. Samuels, to me known to be the identical person whose name is affixed to the above deed as grantor, and he acknowledged the same to be his voluntary act and deed.

Witness my hand and notarial seal.

[SEAL.]
H. A. WILTSE,
*Notary Public, Dubuque.*"

bill, alleging that he had been a purchaser in good faith of the trust property in question, supposing the debt secured thereby to have been paid, and further alleging that Zebulon Dyer, the father of J. J. Dyer, had died in Virginia, leaving a large estate, which had beeen administered upon by the complainant; that J. J. Dyer, in his lifetime, had transferred his interest in said estate to the complainant in full payment of his claim aforesaid; or if this was not so, the said J. J. Dyer's share of said estate, had gone into the hands of the said complainant, and constituted a set-off against his supposed claim. The cross-bill further states, among other things, that Goodrich, the administrator, applied to him, the said Langworthy, to purchase said premises, stating, as did also Ben. M. Samuels and Lucy W. Dyer, that said deed of trust had been fully paid, that afterward, in July, 1856, the terms of the purchase and sale of said premises were agreed upon, but that the said Langworthy declined to receive the deed or pay the purchase-money until the said trustee would produce his authority to cancel said deed of trust; that afterward, in the fall of the same year, Samuels went to Virginia where Newman resided, and on his return exhibited a paper purporting to be a satisfaction of the deed of trust by Newman, and authority to Samuels to cancel the same; whereupon the trade was consummated and the purchase-money paid. It is further alleged that Samuels, while in Virginia, informed Newman of the contemplated sale, and that the money arising therefrom was to be invested in a new homestead, that said Newman consented to such a sale and disposition of the proceeds. It is also charged that Samuels had been and was, at the time of the sale, the attorney of Newman, and had in his hands or possession Newman's claim against the estate, that he was also the attorney of the estate at the same time, and that the allowance of said claim by the County Court was a fraud upon the estate, &c.

The prayer is, that the trust deed be canceled, and that the other conveyances may be confirmed.

These statements were controverted, and upon the pleadings and issues thus made, the depositions and documentary evidence, the cause was heard.

The master to whom the case was referred, recommended that the prayer of the bill should be granted.

Exceptions to this report were sustained; the bill dismissed, and complainants appeal.

*John L. Harvey, Griffith & Knight* for the appellant.

*Wiltse and Kirkwood* for the appellees.

Lowe, J. — Conceding, as we must do, from all the facts brought to light in this case, that the security spoken of in the pleadings, was valid in its inception, and that the debt therein specified has not yet all been paid to Newman, the question still remains whether in consequence of matters subsequently occurring, the lien created by said security has not been lost to the plaintiff, and the property now in controversy discharged therefrom so far as the rights of the defendants have attached, and especially those of Tuttle and the Wakefields.

Our first inquiry will be as to the nature of the instrument, its true character in legal contemplation as a security, how far the rights of the parties thereto were affected or changed by the death of J. J. Dyer; and what were the relations which Samuels sustained to Newman, the creditor, at the time the trust deed or mortgage was discharged, and the sale of the premises made to Langworthy by the administrator.

1. DEED OF TRUST: mortgage in equity.

The language of the instrument *ex vi termini*, fixes its true character and shows it to be simply a security. It commences in this wise: "For the purpose of securing to Anderson M. Newman, of the county of Pendleton and

State of Virginia, the sum of $8,100, with interest from date at the rate of ten per cent per annum, said interest to be paid annually, on the 24th day of June, in the city of New York, &c." Then follows the granting clause conveying the property in question to Ben. M. Samuels, accompanied with the usual power to sell and convey if the money is not paid.

In ordinary acceptation this is called a deed of trust, but in legal effect it is a mortgage, superadded thereto, to be sure, the power of sale, which does not change its essential attributes. Willard's Eq., 430; Story's Eq., § 1018; 4 Kent, 146, marginal; Powell on Mortgages, 9 and 10. In the case of *Woodruff* v. *Robb*, 19 Ohio, 212, the Supreme Court, speaking of a conveyance of land to a trustee as collateral security for the payment of a debt, with power to sell on default of payment, say, the deed in question contains all the substantial qualities of a mortgage, and nothing more. It was a mere security for a debt, to be void if the debt were paid. The fact that the conveyance was made to a person other than the creditor, and that it contained a power to sell, does not change its character as a mortgage. The same general principle was declared in the case of *Sargent* v. *Howe*, 21 Ill., 149; and in the case of *Eaton* v. *Whiting*, 3 Pick., 484, and many other authorities cited in the 11th volume of the American Law Register, 643–649, in an admirable article on the subject of sales and titles under deeds of trust, prepared with great care, arranged under appropriate heads or divisions, the author of which is now a member of this bench (Justice DILLON), and for which it is not too much to say the profession has been laid under many obligations. It would seem from the very thorough research which he has made of the authorities on this subject that the true criterion to be deduced from them is this: " If a transaction resolve itself into a security, whatever may be its form, and whatever

name the parties may choose to to give it, it is in equity a mortgage." 2 Sumn., 533; *Cotterel* v. *Long*, 20 Ohio, 464, 472; *Wilcox* v. *Morris*, 1 Mass. (N. C.), 116; 1 Wis., 527; 5 Ark., 321; 2 Texas, 1.

Again, another reason why a deed of trust, intended as a security, will be deemed to possess the qualities and treated as a mortgage, is, that the legal effect of each class of instruments is the same, and more especially under the statutes of this State; that is to say the grantor of each before foreclosure or sale has the right to redeem, the grantor of each, especially in equity, before sale is deemed the actual owner of the premises and entitled to the use and possession thereof, and in each the grantors' rights are subject to execution.

Now, these are incidents or conditions which do not in law attach themselves or belong to another class of deeds

2. —— Absolute conveyance in trust.
[*infra.*]

of trust, where the grantor parts wholly with his title, giving it to a trustee absolutely for the purpose of raising a fund to pay debts generally without designation or particular debts which may be specified.

It is to this class of trusts where the debts are scheduled that the doctrine applies which requires the purchaser to

3. —— Application of proceeds.
[*infra.*]

see to the due application of the trust fund before he gets a perfect title. The distinction between these different trust-deeds is obvious, and very well drawn by Justice CALDWELL in the case of *Woodruff* v. *Robb*, 19 Ohio, 212.

Besides the incidents already alluded to, separating the two classes of instruments, we may add that the latter could, in no just sense, be treated as a security, but simply a provision which a debtor makes sometimes, in his will, sometimes by a general assignment of his property, and sometimes by deeds of trust, for the payment of debts already existing. In doing so, he usually selects his own

agent, without the knowledge of the creditor, for the exe-cution of the trust thus created.  On the other hand, the former class is made for a different purpose, namely : that of securing a debt in case of default.  It is made usually at the time the debt is incurred and the credit given, when all the terms thereof are mutually agreed upon between the parties, including the agent or trustee who is to exe-cute the same, and who becomes thereby the recognized agent of both parties, with no other powers than those expressed in the deed, which constitute the source and limit of his authority to act in the premises.  We need not say, however, that the power to sell carries with it by necessary implication the power to convey.  If not, it is fair to presume no sale would be ever effected.  And, in this class of securities, if the conveyance is made, the pur-chaser takes the property discharged of the former lien, to get rid of which the sale and purchase took place, and sub-ject to no contingencies arising from the infidelity of the trustee in the application of the funds.

II. Prior to the death of Dyer, if default was made, Newman had his election to proceed in one of two ways to make his debt: by bill in chancery to fore-close the deed of trust, or by directing the trustee to go forward and execute the trust in the method prescribed in the deed.  After his death these remedies were not taken away or impaired, but another was added or supplied to him, under the statute regulating the settlement of estates, namely, by proving and filing his claim for allowance before the County Court, and seeking its satisfaction out of the assets or funds which should come into the hands of the administrator.  This latter course Newman adopted ; his claim was duly filed and allowed.  The trust property, under the order of the County Court, was sold, and the purchase-money paid, and the property duly conveyed, both by the administrator

*4. Satisfaction and discharge of trust deed.*

and the trustee, to the purchaser. We are not inclined to the opinion that Newman, in pursuing this course, waived his lien under the trust deed, without more, nor are we inclined to think that it was competent for Samuels to cancel the deed of trust under the circumstances, if he possessed no other power at the time than what was derived from the deed creating him a trustee.

But we proceed to show that Samuels sustained the double relation of trustee and attorney at law, or collecting agent, to Newman at the time he canceled the deed of trust, and that his act as such is effectual and binding upon Newman.

*First.* As to the fact of this relationship: It is conceded that, by profession, Samuels was a lawyer. During the pendency of the negotiation between the administrator and Langworthy, for the trust property, Samuels visited the plaintiff, in Virginia, and had a conversation with him about his claim against the Dyer estate secured by the trust deed. This claim, evidenced by a note, he takes from Newman for *collection*, as Newman himself avers expressly in his petition, giving a receipt therefor. Samuels brings the note to Iowa. He communicates the fact to Wiltse, the attorney of Langworthy, that he has the same in his possession. He presented and had said claim allowed, and a judgment entered thereon, in the County Court, at the March term, 1857, in favor of Newman. This judgment Langworthy, in his cross-bill, charges was a fraud upon the estate of Dyer, for reasons therein stated. Among them was the charge that Samuels, in the procurement of said judgment, had acted as the attorney for the estate of Dyer and also for Newman, and that he had been Newman's attorney for a series of years. Samuels, who is made defendant in the cross-bill, makes no denial of the allegation that he was acting as the attorney of Newman. But Newman, in his reply to the cross-bill, makes this

answer to the charge: that, upon Samuels advising him that it was required by the statutes of Iowa that all debts due from decedent's estates must be submitted to the county courts for allowance, he thereupon intrusted the said note to the care of said Samuels, for presentation to the County Court for such allowance, and took his receipt for the same; and that, except in the matter herein named, the said Samuels had never been his attorney or legal adviser, &c.; denying, to be sure, that he was his attorney in other matters, and for a number of years, as charged in the cross-bill, but admitting that, in this particular transaction, Samuels was his attorney. This admission, coupled with the allegation in plaintiff's petition that he had given the claim to Samuels for collection while he was in Virginia, establishes beyond all dispute the relation of client and attorney between them, as well as that of trustee and beneficiary. Now there is a very wide difference between the powers, duties, obligations and responsibilities of these two agencies or relations, and the question returns, whether as the attorney of Newman, intrusted with the collection of this claim, it was not competent for Samuels to release the deed of trust at the time and under the circumstances which he did.

Uniting in himself the powers and duties both of trustee and attorney, he was at liberty, in collecting the claim, to adopt one of three courses, in all of which the purchaser of the trust property is equally protected, if the proceedings are regular and lawful, namely: By selling the trust property in the manner specified by the terms of the trust; by foreclosure in equity; and last, through the administration of the estate. He chose, with the concurrence of his client, to adopt the last method. It is not claimed by any one that the administrator acted without authority in selling the trust property now in controversy, or that the sale was irregular and contrary to law, or that Langworthy did

not pay the purchase-money, in fact, to the officer of the law entitled to receive it. Ought he not, therefore, to be protected? The sale was effected and the money paid, ostensibly, for the benefit of creditors, and according to the testimony, a very considerable amount of indebtedness was, · as a matter of fact, paid with this money. That Newman got no part of the money, was not Langworthy's fault, but the neglect and fault of Newman's lawyer, and the administrator, who may have wished to favor the widow of J. J. Dyer. Nevertheless, Newman, as a creditor, was seeking to collect his claim against the estate, through the action of the administrator; he was therefore interested in this sale — interested in the payment of the money under the sale; but this the purchaser very properly refused to do, till the deed of trust was canceled. Was it competent, therefore, for his lawyer, in collecting the money under this process, to release the deed of trust? If the money was not applied to the payment of the Newman claim, it was not because the purchaser had not placed the means in the hands of the proper agents. If the administrator and the attorney violated their trust or neglected their duty in this respect, Newman's remedy is upon them, and not upon the purchaser. If it is said that the release of the deed of trust is not binding upon Newman because no money was paid to or received by his attorney, Samuels, the reply is, that the money was paid, in fact, to an officer of law entitled to receive it, in a legal proceeding in which Newman and his attorney made themselves parties. In principle, it does not differ from a case in court. Suppose Samuels, as the attorney of Newman, had filed his bill in equity to foreclose the deed of trust, obtained his judgment, and sold the property at sheriff's sale. The sheriff would be the officer to receive the money and make the deed; but if the purchaser would not pay the money till the deed of trust was canceled of record, would it not be competent as well as the duty of the

attorney to do so? And if he did, and by some neglect of the attorney or default of the sheriff, Newman did not get his money, could he treat the whole proceeding as a nullity, and go upon the bond a second time for the payment of his claim? A negative answer to such a proposition need not be made.

The fact that Samuels did not present, for allowance by the County Court, the claim of Newman, until March following the 26th of November, when the administrator's sale to Langworthy was finally consummated, is not, in the opinion of the writer, a circumstance that changed the right or power of Samuels, as the attorney and collecting agent of Newman, to cancel the deed of trust. It was enough that he had the claim in his hands at the time, proved up against the estate, as it had been in the month of October before, in Harrisonburg, Virginia, by Newman himself, in the manner presented by the statute. The filing of it was a matter of form, and could have been done any moment. Thus situated, Samuels, the attorney of Newman, who was a preferred creditor so far as the trust property was concerned, had a right to demand and to receive of the administrator so much of the purchase-money paid as would liquidate Newman's claim. Not only so, but the law placed in his hands the means to compel the administrator to pay him if he refused. Under such circumstances, if the attorney did discharge the deed of trust, the purchaser had a right to suppose that he intended to look to the administrator and the estate for the payment of his claim, against whom he had a controlling right, the operation of which would have made the payment and collection of his claim certain beyond any reasonable doubt; and, therefore, the purchaser ought and should be protected, because there was no lack of power, under such circumstances, in the attorney to cancel the deed of trust. The money, as a matter of fact, had been paid, paid by the

purchaser to an officer of the law, in a proceeding under the statute, the regularity of which is not impugned in any particular. The money thus paid is within the legal control, and entirely available to Newman's attorney, and in this condition of things he cancels the deed of trust. If afterward he neglects, having thus made himself a party to the administrator's sale, to demand and take the money of the administrator, and thereby a loss is suffered, it would be the climax of injustice that that loss should be visited upon an innocent purchaser rather than the party who constituted the unfaithful agent.

Without pursuing this topic farther, it is proper to say that the other members of the court forbear to express any opinion upon this question of the power of Samuels to discharge the deed of trust under the circumstances of this case, preferring to limit their affirmance of the case upon other grounds. But as the question was raised and discussed at bar, and lay right in the track of this discussion, the writer supposed that it would not be improper at least to express the views which he entertained upon the subject.

There are two other grounds upon which it is believed 5. ESTOPPEL. this case should be affirmed, which we will now consider.

*First.* For the reason that the evidence, taken as a whole, shows that Newman assented to a sale of the trust property to Langworthy, and a diversion of the proceeds thereof to other purposes than the payment of his claim, whereby he waived his lien, and is now estopped from asserting it against the purchasers of the property.

*Second.* If that is not so, Tuttle and the Wakefields, nevertheless, are subsequent purchasers, without notice of the plaintiff's lien, and, therefore, are entitled to protection.

With regard to the first point, it is not claimed that the

evidence establishes it directly and positively, but that it is fairly and reasonably to be inferred from all the facts disclosed in the case.

To give these facts and circumstances their legitimate weight, we must recur to what happened in the summer and fall of 1856, during the pendency of the negotiations between the administrator and Langworthy for the sale and purchase of the property in question.

After the terms were agreed upon and the deeds made out, both from the administrator and Samuels, the trustee, it seems that Langworthy was unwilling to pay the money and complete the trade, because he was not satisfied that Samuels' release would be good without the authority or assent of Newman, although he was assured that Newman's claim had been liquidated. The consequence was, the trade was suspended from July of that year to the month of November following, to give the parties interested an opportunity to obtain Newman's assent to the cancellation of the trust-deed.

To this end, Samuels and his sister, Mrs. Dyer, who expected to be largely benefited by the trade, it being considered a very advantageous one for the estate, visited Newman in Virginia, in the fall of that year. They knew that the sale of the property to Langworthy depended upon their obtaining the assent of Newman to a release of the deed of trust. They both testify in regard to their interview with Newman, and they say they told him all about the sale of the property, the terms thereof, the price, the name of the purchaser, &c.; and Samuels, without recollecting distinctly the fact, says he could not see how he should have failed to inform Newman also that he had canceled the deed of trust, having done so, as he supposed, in July previous. And they further state that Newman expressed himself surprised and gratified that so good a

sale had been made; that he interposed no objection whatever, but spoke approvingly of it.

Now, if these facts do not show directly the assent of Newman to the sale of the trust property and the cancellation of the trust deed, yet they do in some degree, by implication. For instance, he is made acquainted with the sale, or contemplated sale, of the trust property by the administrator of Dyer's estate. To this he makes no objection. He is made acquainted with the terms of the sale, that is, to whom the property was to go; the amount of the consideration; that it was to be paid in cash, one-half down; to go into the hands of the administrator for the general purposes of the estate. And one of the terms was that the deed of trust should be canceled (and this, as an intelligent business man, as Newman is proved to be, he would reasonably infer the purchaser would require, if he paid the full purchase-money), yet, according to the testimony, to all this he made no objection, but spoke approvingly of it. Now, in addition to this, Samuels thinks he could not have failed to inform Newman at the same interview that he had already canceled the deed of trust. Interposing no objection to this, as Samuels did not recollect that he did, it is to be presumed that he acquiesced; and acquiescence is believed to be assent, from which we may infer that Newman had concluded to waive his lien under the deed of trust, and look to the assets in the hands of the administrator for the payment of his claim. But let us see how greatly this inference is strengthened by other facts and circumstances.

Samuels, in answer to the question whether, after his return from Virginia in the fall of 1856, he was not satisfied, from his interview with Newman, that he, Newman, gave his assent to the cancellation of the deed of trust, says: "*I* have stated before that I did not recollect of Doct. Newman assenting, in direct terms, to the cancella-

tion; but I state now, that after my interview with Doct. Newman in Virginia and my return to Dubuque, I would, without hesitation, have executed the deed of release," &c.

Samuels could not make this declaration, except upon the hypothesis that he had got the impression, from all that Dr. Newman said and did, that he was willing to waive his security under the trust deed and look to the estate for the liquidation of his claim. That Samuels really had this impression is further shown by the fact, that immediately on his return from Virginia, he told Langworthy and his attorney that he had Newman's consent to release the deed of trust.

Again, under this theory of a waiver, it would be most natural for Newman to take steps to make his claim out of the general assets of this estate. This he attempted to do by proving up his claim and having it allowed before the County Court. In explanation of that, however, he says he was advised by Samuels that the statutes of Iowa required him to do so. Samuels, in his testimony, denies, very distinctly, giving Newman any such advice; and he assigns as a reason therefor, that he knew, if the deed of trust was in force, that such a course was not necessary. But, he says, if the deed of trust had been released, then he should have advised as alleged.

Are there not some grounds for concluding, then, that this latter advice was given and that course adopted, because Newman had concluded, under all the circumstances, to waive his security under the deed of trust, and look to the estate for his debt, especially as he had been assured by Samuels that it was worth from $40,000 to $60,000, and abundantly able to pay all its debts? Besides, this theory is strongly corroborated by the character of the letters which Newman afterwards wrote to Goodrich, the administrator. They are three in number, and all dated after Newman had been fully advised of the sale

of the trust property to Langworthy, and the terms and particulars thereof. Yet, with this knowledge, it is remarkable that in none of these letters does he demand or expect any of the purchase-money to be applied on the principal of his debt, but only in payment of the interest. This does not consist with the idea that he had not consented to a diversion of the proceeds of the trust premises to other purposes. It would have been most natural if he had not done so, to insist upon the payment of his debt, because in law it was a preferred debt, and should have been first paid, and in all probability would have been first paid, but for a different arrangement agreed upon between the parties, and in accordance with which the tenor of these letters perfectly harmonizes. Now, Newman had been to Dubuque, and knew that his security rested upon Dyer's homestead. In September, 1856, the administrator, learning that Newman had a claim of some $6,000 against the estate, wrote him, expressing his surprise of that fact, and stated, among other things, that he would be obliged to make sale of real estate, in addition to the order he already had to sell the homestead, before he could be paid, but that his interest should be paid as soon as possible. In the meantime, he desired him to send out his claim and prove it up before the county judge. It will be observed that in this letter, the administrator apprises Newman that he already had an order to sell the homestead or trust property; but before he, Newman, could be paid anything more than the interest on his debt, other real estate would have to be sold. Newman's natural reply to this letter would have been, if his theory of the transaction is the true one, that he could not consent that the proceeds of the sale of the homestead should be diverted to the general purposes of the administration, to the exclusion of his claim, which was the first lien thereon, and for that reason, first entitled to be satisfied. But, instead of this, his reply, which was not made until January thereaf-

ter, is in precise accord with the theory of the defense. He informs the administrator that Mr. Samuels had been there a short time before, assisted him in making out a statement of his claim, and that the same had been forwarded with the bond, to be laid before the county court; and then reminds him that he had said, in the close of his letter, that when the sale of the house was completed, he, the administrator, would remit to him the interest on his debt, and tells him to do so — that it would be a very great accommodation. But this was not done; and Newman, in October, 1857, writes the administrator another letter, complaining of this fact, and says: "So far as I can recollect, I have always taken this position in regard to my debt against the estate of Judge Dyer: that if it was thought best, as it regarded the estate, *the principal of my debt might remain unpaid for a few years.*" Thereby clearly admitting, as we think, that he had consented to a diversion of the fund arising from the sale of the trust property, if only his interest was paid; for it must not be forgotten that when he wrote this letter, he knew of the sale, and that, by the terms thereof, the whole of the purchase-money had been paid, and the purchaser had possession of the property. Yet he does not claim the application of a dollar of it to the payment of his principal debt; doubtless, for the reason that he had consented to a different arrangement, as before stated. The other letter, of a still later date, is of the same general purport, and strongly corroborative of the position occupied by the defense in this case.

Now, these facts (not to speak of others), taken in connection with the lateness of the day in which this suit has been instituted, after a knowledge of all the facts had come to the plaintiff, cannot but strike a plain, unsophisticated mind as exhibiting the plaintiff's claim to be manifestly inequitable, and his object unjust towards the defendants

and their rights; and as such, he must seek some other tribunal in which to effectuate the same.

Before leaving this branch of the case, however, it is proper to state, that in his testimony, Newman denies that he ever assented to the sale of the trust property, or to the cancellation of the trust deed, or that he ever ratified the same, or that he knew that Samuels had released the trust deed until the 5th day of January, 1859, or that he knew who the purchaser was, or what the terms of the sale were, until long afterward, when he obtained such information from the administrator. Now, Mr. Newman is so broadly contradicted, in many of these particulars, by other witnesses and by his own letters, that the accuracy, not to say credibility of his statements in the premises, must be received with some abatement.

The last point of defense is, that Tuttle and the Wakefields purchased of Langworthy the property in controversy, without any notice of this trust deed, and therefore should be protected from the plaintiff's claim.

There are several questions involved in this defense, upon which we will simply express our conclusion, without discussing them, as this opinion is already too long:

*First.* There is no evidence, nor is it claimed that these defendants had any actual notice of the existence of the 6. RECORD-    trust deed. They claim to have had no con-
ING ACT: ac-
knowledg-    structive notice of the same, because the acknow-
ment
[*infra*].    ledgment thereof was too defective to impart such notice. It failed to contain the statement that it was the voluntary act and deed of the parties. The omission of the word *voluntary*, is conceded to be a fatal defect. *Wickersham* v. *Reaves and Miller*, 1 Iowa, 413; but that the defect was obviated in this instance, because, in recording the instrument, the recorder had inserted this word in its proper place, and therefore the instrument, as recorded, was not defective and imparted the requisite notice. We do

not think so. It would be unsafe and dangerous to establish the precedent, that the recorder could change the language of instruments filed for record, and thereby make them read differently from what they did when made and entered into by the parties.

Another answer given to this objection is, that the legislature, in an act approved March 4th, 1858, cured and made effectual all instruments defectively acknowledged and recorded. The validity of this act is not questioned, except where, by its provisions, it is sought to divert vested rights. Before its passage, the defendants purchased and paid $20,000 for the property in question, and by the well settled and established principles of law, they took it without notice of this incumbrance. It was not competent for the legislature to pass a law making that notice to them of an incumbrance, which was not so at the time of their purchase. This question opens quite a field for discussion, and upon which much learning has been expended, but instead of entering the same and culling the considerations which have influenced our minds, we shall simply leave it upon the authority of *Brinton* v. *Seevers*, 12 Iowa, 387, and the authorities there cited.

But what the plaintiff most relies upon, perhaps, in meeting this aspect of the defense, is the notice imparted by the recitals and references contained in the defendants' deed. It is true their deed refers to the source of Langworthy's title, namely, the deeds from the administrator and Samuels, and that these contain recitals showing at one time the existence of the trust deed; and hence it is claimed that the principle applies, that if one person has possession or knowledge of a deed under which he derives title, and it recites another deed which shows title in some other person, he is presumed to have notice of the latter deed. Story's Eq., 400; 2 Leading Cases in Equity, 103.

*[margin notes: 7 and 8. —— Curative act [infra]. 9. NOTICE: recitals in a deed [infra].]*

But in this case, where the recitals in Samuel's deed, which it is claimed imparts to the purchaser notice of the lien, are referred to and examined, the searcher after incumbrances will learn two facts from the same recitals: First, that a lien or incumbrance once existed upon the property: Second, that now it is fully satisfied, the money paid to Newman the creditor and beneficiary, and the lien created by the trust canceled by the trustee nominated in the deed, and all this appears in the recitals of the deed.

To insist, under such circumstances, that these recitals taken as a whole, impart notice of an actual subsisting lien, is to the mind of the writer of this opinion, an absurdity, a contradiction in terms, an impeachment of the intellect and reason. We are at a loss to conceive upon what ground or principle Tuttle and the Wakefields, the second grantees under the administrator and trustee, are required to push their inquiries any further, unless it should be a necessity that springs out of the doctrine that the purchaser is bound at his peril to see to the application of the purchase-money. If this doctrine was applicable, we apprehend it would hardly be extended beyond the first purchaser of the trust property. It would be strange indeed if this doctrine should be held binding upon all subsequent purchasers.

3. —— Application of proceeds [*supra*].

But we have before shown that it has no application to this class of trusts, that it is limited in its range to a description of trusts absolute upon their face, and created, not simply as a security, but to raise a fund for the payment of existing debts. The distinction between the two classes of trusts is palpable, and will be more clearly perceived and understood by considering the reason upon which the doctrine is founded. At law it does not obtain, but only in equity. The reason why a court of equity insists upon its enforcement under certain contingencies, is that the trustor in such cases is wholly divested of all

interest in the property, retaining nothing, whilst in equity the beneficiary is deemed to be the real owner, and as such cannot be divested of his ownership until the object of the trust is executed. Hence the responsibility is thrown upon the purchaser before he can get a perfect title as against the beneficiary to see to it that the latter is paid, for until this is done, his title as owner is not extinguished, nor the end of the trust fulfilled. *Elliot* v. *Merryman*, 1 Leading Cases in Eq., 80, notes.

Now, the very converse of this is true in regard to the class of trusts before us. In equity the trustor is deemed to be the real owner until after a sale; the beneficiary as simply having a chattel interest, or a security for debt. The constituents of the two instruments are widely different. And, inasmuch, therefore, as the reason for the application of the doctrine in question, based as it is, upon the supposed ownership or estate which the beneficiary has in the trust property in the one case does not, and cannot exist in the other; therefore, the rule which requires the purchaser to see to the application of the trust fund, can have no place in this class of securities.

Unable, then, to see any sufficient reason why Tuttle and the Wakefields should not be protected as innocent purchasers in the premises, the majority of the court, for this, as well as other reasons above suggested, is disposed to affirm the judgment below.

Affirmed.

DILLON, J.—In a case which has been three times argued, which involves so large an amount in value, and presents so many questions at once difficult and important, it is not surprising that different opinions should be entertained concerning the true grounds for its decision. In the view I take of it, I am not called upon either to con-

cur in or dissent from the positions assumed in the very thorough and elaborate opinion of Mr. Justice LOWE.

I put my decision wholly upon one ground, viz.: that Tuttle and the Wakefields, the present owners of the pro-

6. RECORD- perty, *had no notice, actual or constructive, of the*
ING ACT:
acknow- *trust deed of the plaintiff, and hence stand free from*
ledgment
[*supra*].   *its operation.* Were it not for the space already devoted to the case, I should examine it and set forth my reasons much more at length than under the circumstances would be proper. If the ground above stated is tenable, it disposes of the case; and that it is tenable, I proceed with all possible brevity to show, noticing nothing which does not lie directly in the path of this inquiry.

It is beyond all dispute that Tuttle and the Wakefields, at the date of their purchase from Langworthy, August 1st, 1857, had no *actual* notice of the plaintiff's deed of trust.

This the plaintiff substantially admits or scarcely denies, but he claims that they had constructive notice of his trust deed.

The learned counsel for the plaintiff, in view of the prior decisions of this court, admit that the acknowledgment to the trust deed, in consequence of the omission of the word "voluntary," is fatally defective, and did not authorize it to be recorded.

This, as against Tuttle and the Wakefields, who are purchasers for value and without actual notice, is obviously an end to the plaintiff's case, unless this defect has been cured or obviated. That it has been thus cured or obviated, the plaintiff maintains upon two grounds, each of which it is necessary to consider, viz.:

1. By the curative act of July 4, 1858. (Rev., § 2249.) This went into force nearly eleven months *after* Tuttle and

7 and 8. — the Wakefields purchased the property from
Curative act
[*supra*].   Langworthy, received their deed and paid their money for it. Their rights were fixed at this time. They

had no actual or constructive notice (leaving out of view the question arising on the recitals in their deed, and which will next be considered) of the plaintiff's lien. Their title against the plaintiff was perfect for nearly eleven months after they received their deed. It strikes me that it would be a monstrous and arbitrary act of injustice if by a law subsequently passed, the defendants, Tuttle and the Wakefields, could be divested of their rights. Directly against the plaintiff on this point, is the case of *Brinton* v. *Seevers*, 12 Iowa, 389, which arose upon the curative statute under consideration. This his counsel concede, but claim and have made an able argument to show that this decision is wrong. The writer has examined the question with some care, and is satisfied the decision is right. That the legislature may give laws a retrospective operation in some cases, and even where private rights may be incidentally affected, cannot, in the absence of a specific constitutional prohibition, be denied. On the other hand, it is equally clear that the legislature has no constitutional power arbitrarily to divest or take away the title or rights of an owner of property. *Childs* v. *Shower*, 18 Iowa.

Retroactive laws in furtherance of equity and good morals (*Trustees of Cuyahoga Falls Real Estate Association* v. *McCaughy*, 2 Ohio State R., 152); or just, reasonable and conducive to the public good (*Goshen* v. *Stonington*, 4 Conn., 209; 6 Id., 58; 7 Id., 319, 351); and which violate no rule or principle of justice or morality (*Menger* v. *Wertman*, 1 Pa. St. Rep., 218; *Baugher* v. *Nelson*, 9 Gill., 299; Sedgwick on Constitutional Law, 177, 202, 411, 412, 671), will be sustained. But not where they unjustly or unwarrantably interfere with the vested rights of property.

Thus, laws validating acknowledgments of *femes covert*, and others; the registration of ancient or other deeds; are sustainable against the grantors or their heirs or devisees. *Watson* v. *Mercer*, 8 Pet., 88; *S. C.*, names reversed, 16

Serg. & R., 35; referred to by GIBSON, Ch. J., in 1 Pa. St. Rep., 218, 223, as based upon moral obligation to convey; and see also *Satterlee* v. *Matthewsen*, 2 Pet., 380; *Webb* v. *Den*, 17 How., 576.

But, on the other hand, a law which vests in the issue of an illegimate child, an estate which had descended to the right heirs of the intestate, is invalid. *Norman* v. *Heist*, 5 Watts & Serg., 171; and see *Lucas* v. *Sawyer, ante*.

Let these suffice as samples of the two classes of cases. The principle is this, as stated by the Supreme Court of Pennsylvania, in *Menger* v. *Wertman*, before cited: Where the purchaser has paid for land, and the prior owner is consequently under a moral obligation to convey, the legislature may constitutionally give effect to this moral obligation, against such owner, his heirs, widow, &c. "But I trust," says Ch. J. GIBSON, "that we [the courts] shall never go further."

Let us apply the principle to the case in hand.

The curative act would be valid against Dyer, his widow, heirs, &c., because Dyer undertook, and his widow joined with him, to execute to Newman a perfect conveyance, for a valuable consideration paid, and they are under a moral obligation to do so. But I fail to see any conscientious or moral obligation resting upon the *bona fide* vendees of Langworthy, who have fully paid for the property, to allow Newman to have priority over them.

Thus far, then, standing alone upon the prior decisions of this court, which are in part unquestioned, and which, so far as questioned, I have shown to be sustained by authority, as they undoubtedly are in reason and principle, Tuttle and the Wakefields stand free and clear from the plaintiff's deed of trust.

The plaintiff, to obviate the defect in the acknowledgment of the trust deed, claims, this being his only other ground:

2. That Tuttle and the Wakefields had notice thereof, 9. NOTICE: because of the *recitals in the deed from Langwor-* recital in a deed. *thy to them.*

Here it is especially to be noted that *their deed does not recite the existence of the trust deed to Newman.* But it does refer to the deed of release or reconveyance from Samuels, as trustee ; and it is this latter deed, and *this alone,* which refers to the trust deed, and refers to it *only* for the purpose of stating that it is *canceled and paid.* So that the only instrument by which Tuttle and the Wakefields have notice of the trust deed itself, recites that the trust deed is no longer an operative and existing instrument.

I admit the proposition contended for by the plaintiff's counsel, " that a purchaser has constructive notice of every-thing which appears in any part of the deeds or instruments which prove and constitute the title purchased," provided " they are of such a nature that, *if communicated directly to the purchaser, they would have operated as actual notice.*" 2 Lead. Cas. in Eq., 3d edition, 168, 169 ; *Le Neve* v. *Le Neve,* and cases there cited. That is, this constructive notice can have *no greater effect* upon the purchasers than if Samuels, the trustee, had, *during the negotiations for the purchase, verbally communicated to them the same facts, and those only, which are set forth in his deed of release.* These facts are, that the property had at one time been conveyed to him in trust, but that this trust was satisfied, the debt being paid. So that the precise question is, if Samuels had made such a communication, would they, in law, have been bound to credit one part of the statement and dis-credit the other ; to believe him when he stated that there had been a trust deed, and to disbelieve him when he, at the same time, stated that it was paid ?

Now, information of the existence of a lien upon pro-perty may come from three sources :

1. From *others,* strangers to the transaction. When this

is the case, the purchasers cannot, in safety, resort to and rely upon the statements of the debtor, an interested party, that the debt is paid.   It is his duty in *such* cases to inquire further and from more authentic and trustworthy sources ; and, if practicable, it may be his duty in some cases to resort to the lien creditor himself.   Notes to *Le Neve* v. *Le Neve*, 2 Lead. Cas. in Eq., 3d edition, 159, 160, 161, citing *Price* v. *McDonald*, 1 Md., 403, 419 ; *Hudson* v. *Warner*, 2 Har. and G. 415 ; *Russell* v. *Petreo*, 10 Ben. Mon., 184 ; *Hall* v. *Noble*, 40 Maine, 459 ; *Warner* v. *Scott*, 11 Fost., 332.

If, therefore, in this case, the deed to Tuttle and the Wakefields had *itself* recited the existence of the trust deed, and no more, or if they had received notice of it from other sources than Samuels, it does not follow that they could rely alone, to countervail the effect of such notice, upon the recorded deed of release, or upon Samuels' statement that the trust deed was satisfied.

Again, information of the existence of a trust deed, or prior right, may come from the *debtor or vendor himself.* Suppose he informs the purchaser, pending his treaty, that there had been a mortgage upon the property, but it had been paid, or that he had before sold the property to another person, but the sale had been rescinded, the question has arisen in numerous cases, where the person receiving this information is bound to inquire further.   That he is not, see *Buttrick* v. *Holden*, 13 Metc., 355 ; *Center* v. *Blair*, 4 Cush. 310 ; *Rogers* v. *Jones*, 8 N. H., 264 ; *Jones* v. *Smith*, 1 Hare, 431.

But that he is bound to inquire further, at least may be bound, will be seen by referring to the cases above cited from the Leading Cases in Equity.

From an examination of all of these cases, I am satisfied they do not really conflict, and that each case must be decided upon its own circumstances.   But in the case at bar,

the information to Tuttle and the Wakefields did not proceed from the *debtor* or an interested party.

Again, information of the existence of a prior right may come from a *disinterested source.* And the rule in such cases is well stated by Judge HARE (2 Lead. Cases in Eq., 3 ed., 159), thus : " The general principle that no one is bound to suspect fraud or imposition, is unquestionably sound, and will protect the purchaser whenever the information on which he relies is communicated to him by a *third* person *who is disinterested,* or has shown no known or assignable motive for suppressing part of the truth, while revealing the residue." See *Rogers* v. *Wiley,* 14 .Ill., 65 ; remarks of TRUMBULL, J., page 67 ; and of WILDE, J., 13 Met., 357. " The whole notice," says PARKER, J., 8 N. H., 269, "must be taken together." If this is so where the information is communicated by a disinterested person, *a fortiori,* must it be so when communicated by the trustee named in the deed of trust? Why? I answer:

1. Because, he is not only disinterested, but the parties declare their confidence in him by his selection.

2. If interested at all, trustees are usually interested, in feeling, at least, with the beneficiary or creditor. Why so ? For the reason, as we all know by our experience, that he, unlike trustees proper in other cases, is almost universally selected by the creditor. The borrower is the slave of the lender. The lender, as was well observed on the argument, is " master of the situation." He therefore selects the trustee, a person in whom he has confidence. Samuels had the confidence of Newman, not only at the date of the trust deed, but intrusted him with the note secured by the trust deed pending the purchase by Langworthy, and Samuels had possession of the note, and to the attorney of Langworthy declared it to be paid.

3. The trustee has the *legal title,* so the authorities all hold. They are collected in 2 Am. Law Reg., N. S., 665.

He holds it, 1st, for the payment of the specific debt; and 2d, for the benefit of the grantor, if the debt is paid or anything is left. Id., 657. On the payment of the debt it is his duty, and he has the power, to reconvey the property, and thus revest the title and satisfy the trust deed. In all my examination I have found no case, as applied to instruments of this class, which settles the question who should *satisfy them of record*, the *trustee or beneficiary*, or how far, if at all, the latter, as against purchasers for value and without notice, would be bound by a fraudulent satisfaction or reconveyance by the trustee duly recorded. Certain it is, that a reconveyance by the trustee is the usual and appropriate, if not necessary, course. A satisfaction by the beneficiary would doubtless be good in equity; perhaps, under the modern view, also at law. There was nothing, then, in the fact that Samuels had made a reconveyance which was of a nature calculated to excite the alarm or suspicion of the purchaser, but just the contrary.

If the recital in the deed of the trustee of the existence of the Newman deed of trust was of a nature to put the purchaser upon notice, the next recital, that it was paid, would reasonably disarm him. The same instrument contained bane and antidote; the one recital was neutralized by the other. Let it be noted that the exigencies of the position of Tuttle and the Wakefields do not compel them to seek shelter behind, or rely upon, the Samuels release. They claim nothing under it. They do not rely upon it to defeat the plaintiff's trust deed. On the contrary, it is the exigency of Newman's case which drives him to set up the Samuels release. It is *only* by and through this very instrument that he affects Tuttle and the Wakefields with notice of his lien. He repudiates this act of Samuels, yet, strange to say, it is through this act, and this alone, that he can claim any relief as against the present owners of the

property. If he wishes to avail himself of this act of his trustee, he must take it *cum onere*, the bitter with the sweet.

As the soundness of my opinion depends upon a series of propositions logically connected, and to some extent inter-dependent, I recapitulate them.

1. The present purchasers, Tuttle and the Wakefields, had no actual notice of the plaintiff's trust deed.

2. They had no constructive notice.

(a) Because the trust deed was defectively acknowledged, and this defect was not cured by the act of July, 1858, as to the present owners.

(b) Because the recital in their deed did not refer to the trust deed, but simply to Samuels' release. This release can operate as *constructive* notice to no greater extent than if Samuels had actually communicated to them the same facts pending their negotiation. That when information of a lien comes from a *disinterested* informant, who at the same time states that it is no longer existing, the purchaser will not ordinarily be bound, acting in good faith, to inquire further. Much more is this the case where, as in this instance, the only information of a prior deed of trust comes from a trustee in an ordinary deed, in the usual form and for the very purpose of saying and declaring that the trust is satisfied.

It is not to be inferred that, if the original deed of trust had been duly recorded or recited as being in existence in any of the title papers of the defendant, or if the present owners of the property had had independent actual notice of it, that they could have relied *solely* upon the Samuels release as a protection, if the trust deed was not in fact paid. Such a question would be very different from the one decided.

In conclusion, I remark that in the views above advanced I have the concurrence of all of the members of the court.

But I am instructed by the Chief Justice to say that, while he concurs in an affirmance upon this ground, he, like the writer, does not wish to be committed to the chief ground presented in the opinion of Mr. Justice LOWE