# SUPREME COURT

OF THE

## STATE OF IOWA

AT

## DES MOINES, JANUARY, MAY, AND SEPTEMBER TERMS, 1921.

---

D. J. McMahon, Appellant, v: Frank A. Gotch et al., Appellees.

MORTGAGES: Absolute Deed as Mortgage. An absolute deed, honestly obtained on a fair and approximately adequate consideration, with a naked option to vendor to repurchase, will not be held to be a mortgage, even though the only consideration for the deed is money loaned by grantee to grantor, when it appears that the parties mutually intended the absolute deed to act as a satisfaction of the said loan and of a former deed admittedly given and held as a mortgage.

*Appeal from Hamilton District Court.*—H. E. Fry, Judge.

November 26, 1920.

Rehearing Denied March 11, 1921.

Suit in equity to redeem land from an alleged mortgage which was, in form, a quitclaim deed. After trial upon the merits, there was a decree dismissing the petition.—*Affirmed.*

*Wesley Martin* and *Martin & Alexander,* for appellant.

*Healy & Faville, Max Hemingway, Price & Burnquist,* and *Lovrien & Lovrien,* for appellees.

EVANS, J.—The present defendant is the administratrix of Frank Gotch, the original defendant. For convenience of discussion, we shall treat Frank Gotch as the continuing defendant. Prior to September 23, 1914, the plaintiff was the owner of a tract of land in Hamilton County, consisting of 1,065 acres, largely submerged, and known as Iowa Lake. On that date, he conveyed the same by quitclaim deed to the defendant Gotch, for a stated consideration of $45,000. It is now contended that the deed, though absolute in form, was mutually intended as a mortgage, and plaintiff prays that it be decreed to be such, and that he be permitted to redeem from the same. At the time the deed was made, Gotch held a previous deed for the same property, under date of September 26, 1913. This deed was concededly mutually intended as a mortgage. The second deed purported to terminate the mortgage character of the first deed, and to satisfy the indebtedness owed by the plaintiff to Gotch, by the following paragraph thereof:

"The certain deed made by D. J. McMahon and Julia L. McMahon to Frank A. Gotch bearing date of September 25, 1913, conveying this same land is declared by the grantors herein and by the grantee herein to be in fact a mortgage. And the indebtedness which said deed secured having been canceled and satisfied, this deed is made for the purpose of vesting the fee simple title to the lands therein conveyed in Frank A. Gotch, the grantee."

The prior relations between these parties are sufficiently indicated by the following testimony of the plaintiff:

"My dealings with Frank Gotch were always of a rather intimate and personal character. Our respective family relations were intimate, cordial and friendly. Our families visited at each others' homes. When Mr. Gotch would go to St. Paul, if I knew he was there, I would see him and visit with him. Mr. Gotch was a wrestler, the world's famous wrestler. I have attended wrestling bouts when he was a participant, and I acted

in some fiduciary or confidential relation to Mr. Gotch on occa-sions of that kind. * * * In my business relations with Mr. Gotch, I always found him to be a man of honor, truth, and in-tegrity. I never found him in any degree tricky, dishonest, or unreliable.''

The plaintiff was a resident of St. Paul, and a large dealer in real estate. In the course of his experience as such, he had handled several hundred thousand acres of land. At the time of the transaction under consideration, he was the owner of 25,000 or 30,000 acres. He was a man of large means. He first borrowed money from Gotch in 1906. Later, loans were made from time to time, no part of any of which had ever been paid, prior to the transaction here under consideration. On September 26, 1913, when the first quitclaim deed was made, the indebted-ness owed to Gotch and the incumbrances upon the tract in-cluded in the deed amounted to over $30,000, the larger part of which was in the form of incumbrances. In September, 1914, Gotch requested a settlement of some kind, and negotiations were had to that end, which resulted in the deed of September 23, 1914, and an option agreement signed by Gotch, offering to per-mit the plaintiff to repurchase the land on or before August 1, 1915, for the amount invested therein by Gotch, which was above $42,000, including incumbrances upon the property. This option was never exercised by the plaintiff, although he attempted, dur-ing the period of its existence, to procure a buyer at a price which would justify his exercise of the option. Shortly prior to August 1, 1915, some correspondence ensued on the subject, wherein plaintiff abandoned all claim to the option. There was no other consideration paid for the deed in question, except the existing indebtedness due to Gotch at the time the deed was made. This is one of the important circumstances upon which counsel for plaintiff relies. This is buttressed by the conceded fact that the deed of September, 1913, was intended as a mort-gage, and by the further fact that Gotch signed an option agree-ment, giving to plaintiff the right of repurchase on or before August 1st. These are circumstances of considerable weight, and, were it not for other features of the record, would go far toward the establishment of plaintiff's contention. Equity is zealous to relieve an embarrassed debtor from the power of his

creditor to drive a hard and unconscionable bargain within the moment of his helplessness. But if, under all the circumstances surrounding the parties, the transaction was a fair one, free from oppression or taint of fraud, such contract will receive the same recognition as any other. It is not legally impossible for a debtor to transfer to his creditor the mortgaged property in satisfaction of the debt. The fact that the first deed was a mortgage loses much of its probative effect as tending to establish the same character upon the second deed, by the further fact that, after its execution, the plaintiff had incurred further indebtedness to Gotch to an amount between $8,000 and $10,000. The fact that the only consideration paid for the second deed was the existing indebtedness owed to Gotch is also dependent for its probative effect upon the question of value of the property conveyed. If the value of the property was largely in excess of the indebtedness, the circumstance becomes a strong one. If it was not, the circumstance loses its greater force. The real ultimate question to be determined, however, is: What was the real mutual intention of the parties?

On the question of value, many witnesses were used on both sides. Witnesses on behalf of the plaintiff placed the valuation at a range of from $50 to $70 per acre. Those on behalf of the defendant placed the same at from $33 to $40 per acre. All agree that the property was unsalable. Large expense had been incurred in tile drainage, but the outlet had proved inadequate, and the enterprise had fallen short of success. Only 130 acres thereof were capable of cultivation. The tract comprised about 700 acres of peat lands of such character as would not produce corn. As bearing upon such question of value, it is proper to consider that McMahon made a diligent effort, with the use of all his facilities as a real estate agent, to find a purchaser at a price that would give him any margin over and above the indebtedness. These efforts had continued from the date of the first deed for a period of nearly two years. After Gotch acquired the second deed, he appears to have made diligent effort to find a purchaser at a price that would pay him back his investment. He offered it at such price. He tried to form a syndicate of three or four persons to join him in the ownership of the tract, with a view to improving it. His offer was to put it in at what it had

cost him. Some witnesses, in response to such offer, went to see the land. None were tempted by it. We give consideration to this circumstance, because of the conflict of opinion of the respective groups of witnesses to value on the opposing sides. As against this circumstance, it is made to appear that, in October, 1915, Gotch did dispose of the land at a consideration stated in the deed of somewhat over $69,000. This, however, represented the inflated valuations of a mere trade. The consideration so put in included real estate in the Black Hills of South Dakota, city lots, an icehouse, horses, wagons, and the implements incident to an icehouse. The testimony is undisputed that the valuations of such property were inflated from five to tenfold. The consideration stated in the deed, therefore, is not persuasive on the question of actual value, nor does it render the attitude of Gotch inconsistent because it also appears that he had listed the land with a real estate agent at a price which would only reimburse him, leaving to the agent as a commission whatever excess he could obtain. The agent negotiated the trade in question. The trial court found the valuation in accord with the witnesses for the defendant. We think such finding is consistent with all the circumstances appearing in the record. So far, therefore, as the question of value is concerned, we find that the existing indebtedness was a fair price for the land, and that it was a greater price than Gotch would have given for the land, if he had been free from the entanglement of his loans.

That the real mutual intention of the parties was that the second deed should operate as an actual transfer, not only appears by the express provisions of the deed, as above quoted, but it appears very clearly from the subsequent conduct and correspondence of the plaintiff himself. Up to the time of the execution of the second deed, he had continued in charge of the land. He rented it and collected the rents. After the execution of the deed, he ceased such relation. He claimed no right or interest of any kind, except the right to repurchase under the option. In August, 1915, he wrote to Gotch the following letter:

"St. Paul, Minn., August 31, 1915.
"Mr. Frank A. Gotch, Humboldt, Iowa.
"Dear Frank:

"I had a letter today from Sam Devenbaugh, the renter on the Hamilton County farm, stating that he had threshed his oats, 25 acres, which turned out 953 bushels. He was to give two fifths (2/5) of the crop, which would amount to 380 1/5 bushels. The oats have been placed in an elevator at Williams. He reports that the market at the present time is 32¢. You will please instruct Devenbaugh or the Elevator Company when you desire to have them sold.

"The reason that he sent this report to me is that I have not advised him of the fact that I parted with the title to this land for the reason that I didn't care to advertise the matter any more than is necessary, as I feel that it undoubtedly would effect my credit and as I need about all of that that I have got at the present time, I am not voluntarily doing anything to make it any harder for myself than is necessary.

"Are you coming up to the races on Saturday? If so, I hope that I will have an opportunity to see you.

"With kind regards, I am,

"Yours very truly,

"D. J. McMahon."

Devenbaugh, referred to in this letter, was the renter. After the beginning of this suit, the plaintiff wrote to the widow of Gotch as follows:

"I certainly appreciate the many favors that I received from Frank, and I have never made any statements to anyone that were not laudatory of Frank's treatment to me. I simply feel that we have been looking at our business transactions from a different viewpoint, and I have always felt that if we could have arranged to have discussed these matters personally that we could have arrived at a settlement. I can understand how we might honestly differ in reference to the Hamilton County farm, *for Frank undoubtedly was of the opinion that when he received the second deed from me to the Hamilton County farm that the incident was closed so far as my having any legal claim on him was concerned.*"

Considerable other correspondence appears in the record which leaves no room to doubt that McMahon intended the deed to be a satisfaction of his indebtedness. His indebtedness was

actually satisfied both by the statements contained in the deed and by the indorsement on the notes themselves. Gotch could not have sued upon such indebtedness thereafter, nor could he have maintained an action to declare the deed as a mortgage. Both parties assumed the same attitude with reference to the transaction. There was no contrary suggestion from McMahon until about two years thereafter. He knew of the transfer of the land by Gotch, and knew of the fact *from* Gotch. He raised no question as to Gotch's right in the matter. He asked Gotch to protect him against a contract which he had made with his tenant concerning payment for fertilizer. He asked Gotch to require the purchasers to assume that burden. This request was complied with by Gotch. The bringing of this suit was a complete change of front on the part of McMahon. Some point is made of the fact that the option contract was never signed by McMahon. There was no occasion for his signing it. He bound himself to nothing therein. He was free at any time to accept or to reject. Some point is made, also, upon the fact that the option contract was not sent to him. It appears that that paper, as well as the canceled notes, was left in the hands of Gotch's attorney at Humboldt, and remained for some months in his safe. The explanation of the attorney is that McMahon had written him that he would be at Humboldt, and the papers were held, awaiting his coming. The option had been submitted to McMahon by mail before it was signed by Gotch. He returned it with his approval, and it was accordingly signed, and he was notified accordingly. He knew its contents at all times, and acted upon them. The option itself, duly executed, was actually sent to him in July. It does not appear that he suffered any disadvantage on account of the custody of the option, nor does he claim any. When it was delivered, he made no objection. On the contrary, his letters declared him as satisfied with the treatment accorded to him by Gotch. We think the trial court reached the correct conclusion upon the record, and its decree is, accordingly, —*Affirmed.*

WEAVER, C. J., PRESTON and SALINGER, JJ., concur.