GEORGE W. BILBO, Appellant, v. F. D. BALL et al., Appellees.

MORTGAGES: Absolute Deed As Mortgage—Adequate (?) or Inadequate (?) Price. Whether the contract price for real estate represents the fair or approximate value of the property is a material inquiry on the issue whether the contract was intended as an absolute purchase or as a mortgage only.

MORTGAGES: Absolute Deed as Mortgage—Estoppel to Assert Secret Equity. An owner of property who enters into what appears to be an *absolute* written contract of sale, and makes and delivers a deed

to the purchaser's bona-fide *assignee*, may not thereafter set up against said assignee the claim that the contract and deed were intended to perform the function of a mortgage, when the said assignee acquired his rights without notice of the grantor's hidden equity.

WEAVER, ARTHUR, and DE GRAFF, JJ., dissent, on the present record.

**WITNESSES:** **Transactions With Deceased—Assignee Protected.** One who contracts to convey his property, but executes the deed to the contract purchaser's assignee, and later seeks to enforce against the *assignee* a secret claim that the deed was intended as a mortgage, is incompetent to testify to material personal transactions and communications with the contract purchaser, who is deceased.

**MORTGAGES:** **Nature and Essentials—Involuntary Mortgagee.** A debtor who, in contracting for the sale of his land in order to effect security, provides that a portion of the selling price shall be paid to a third party creditor, does not thereby constitute such creditor his *mortgagee*. In other words, he may not enforce such an accounting against the said creditor as he could enforce against his immediate grantee in the sale.

WEAVER, ARTHUR, and DE GRAFF, JJ., dissent to the application on the present record.

**EVIDENCE:** **Parol as Affecting Writings—Absolute Contract as Conditional Contract.** An unambiguous written *contract* for the *absolute* sale of realty at a stated price may not, in the absence of fraud or mistake, be converted by parol evidence into a contract for the sale *as a mortgage*.

**JUDGMENT:** **Lien—Equitable Interest.** Principle reaffirmed that a district court judgment is a lien on an equitable interest.

**CONTRACTS:** **Legality—Usurious Provision.** An alleged usurious provision will not be permitted to invalidate a contract when the provision (1) was dependent on a contingency which never happened, and (2) is capable of being construed as nonusurious.

*Appeal from Union District Court.*—HOMER A. FULLER, Judge.

MARCH 10, 1921.

OPINION ON REHEARING, JUNE 23, 1922.

REHEARING DENIED DECEMBER 15, 1922.

SUIT in equity, wherein plaintiff prays that a conveyance of land made by him be construed and decreed to have been a mortgage only, and that he have an accounting thereunder from the defendants. The trial court dismissed the petition, and the plaintiff has appealed.—*Affirmed.*

*Frank B. Wilson* and *D. W. Higbee,* for appellant.

*Thos. L. Maxwell, Kenneth H. Davenport,* and *Ladd, Warren & Ladd,* for appellees.

EVANS, J.—At the time of the transactions under consideration, the plaintiff was, and for many years had been, an extensive dealer in real estate. The transaction under attack had its beginning on August 3, 1916, when the plaintiff, Bilbo, executed and delivered to F. D. Ball an option to buy a 240-acre farm, at a price of $160 per acre. This option contract provided, in substance, that the remnant of the purchase price over and above three certain mortgages upon the farm should be paid to the defendant Iowa State Savings Bank, upon certain indebtedness of Bilbo to said bank. This option was allowed to lapse by expiration of time, and was later revived by a written renewal. On September 29, 1917, the option was exercised by Ball, and a written contract of purchase and sale was entered into between him and Bilbo. Some time thereafter, Ball sold a half interest in the contract of purchase to the defendant Stream, on a valuation of $165 per acre. On December 19, 1917, Bilbo and wife executed to Ball and Stream a warranty deed, subject to the existing mortgages on the farm, amounting to $30,000 in principal and interest. In November of the year 1918, Ball and Stream sold the farm for $200 per acre. Ball and Stream paid the full amount of the incumbrances upon the farm, and paid the balance of the purchase price of $160 per acre to the Iowa State Savings Bank, to apply upon the indebtedness of Bilbo. The plaintiff seeks in this suit to take the benefit of $40 per acre profit made by Ball and Stream upon a resale of the farm.

According to the testimony of plaintiff as a witness, his oral negotiations leading up to the first option contract began with one Davenport. Davenport was the nonactive president of the

Iowa State Savings Bank. That is to say, he was engaged in the loan and abstract business on his own account, and was not concerned with the ordinary daily operation of the bank. Bilbo was desirous of obtaining $7,000, for the purpose of financing a land contract whereby he was purchasing 14,000 acres of Wyoming land for such sum. This conversation with Davenport was had in Davenport's office, where he engaged in the loan business. Davenport said to him that he had no money of his own, but would "see what he could do;" and that he would go and see Ball, who was the cashier of the Iowa State Savings Bank. Bilbo was already indebted to this bank in the approximate amount of $6,400. The conversation with Ball resulted in the option contract which will be later set forth. The parties to the option contract were Bilbo, on the one part, and Davenport and Ball on the other. Davenport never exercised the option, and never assumed any burden thereunder nor claimed any benefit therefrom. Ball alone exercised the option, and he alone entered into the contract of purchase with Bilbo, and he alone assumed liability for the payment of the full purchase price. Davenport was never made a party defendant herein. Ball was made a party defendant, but he died, pending the suit, and before the trial. The death of Ball was suggested to the court at the time of the trial. Neither party would ask for a substitution of his administrator, and the court declined to make such substitution upon its own motion. The action, therefore, abated as to Ball, and this is conceded by both sides. We have before us, therefore, as defendants, Frank L. Stream and the Iowa State Savings Bank, and none other. The question before us, therefore, is not what right or remedy the plaintiff has against Davenport or against Ball. The option contract purported to be with Davenport and Ball personally. The contract of sale entered into purported to be with Ball personally, and with him alone. The warranty deed executed purported to be to Ball and to Stream personally.

If it were found or assumed that the contracts entered into with Ball were intended as a mere security, and that Ball was merely a trustee therein, the controlling questions would still remain:

(1)   What right or remedy has the plaintiff, as against the defendant Stream?

(2)   What right or remedy has he, as against the defendant Iowa State Savings Bank?

The loan of $7,000 was procured from the Iowa State Savings Bank. Bilbo executed his note therefor, and also a mortgage securing the same, covering the Wyoming purchase. Later, Bilbo sold the Wyoming property, and received a purchase-money mortgage therefor in the sum of $28,000. This was accepted as collateral by the bank, and its original mortgage was released. Nothing appears ever to have been paid on this collateral. The mortgage upon the Wyoming property was made to include, not only the $7,000 borrowed for the purchase, but the existing indebtedness to the bank of $6,400 also.

The initial option contract, which is designated in the record as Exhibit P, and which will be so referred to in the discussion herein, was as follows:

"Memorandum of agreement entered into this 3d day of August, 1916, between Geo. W. Bilbo, party of the first part, and D. Davenport and F. D. Ball, of the second part (all of Union County, Iowa), witnesseth:

"That in consideration of the second parties' furnishing or causing to be furnished to Geo. W. Bilbo the sum of seven thousand dollars, in cash, to carry through a certain trade for land in Sweetwater County, Wyoming, involving about 14,000 acres of land, the first party agrees, as follows:

"That said amount of seven thousand dollars shall be secured by first mortgage on said 14,000 acres in Wyoming, together with the amount now due said bank, same to be payable March 1, 1917.

"Second: That a commission of $500 shall be added to the amount due, payable March 1, 1917, and included in said mortgage.

"Third: That the said parties of the second part are hereby given an option, good at any time up to and including the third day of October, 1916, to purchase from said Geo. W. Bilbo, the 240 acres of land owned by him in Section 24, Spaulding Township, Union County, Iowa, known as the Bunzendahl land,

at a price of one hundred and sixty dollars per acre, settlement to be made March 1, 1917, and all incumbrances then due or existing to be deducted therefrom. Warranty deed and abstract showing good title, merchantable title to be furnished in case trade is consummated.

"It is further agreed that this option, in case it is not exercised up to said third day of October, 1916, shall be extended to January 1, 1917; but that following October 3, 1916, the said Geo. W. Bilbo shall have privilege of selling said land himself, if opportunity offers; it being contemplated that either the party of the first part or the parties .of the second part may make sale, and in case sale is made by either, the other party is to be notified thereof within 24 hours.

"It is understood further, that in case the parties of the second part elect to exercise their option, either during the first sixty-day period, or the second ninety-day period, the $500 obligation for commission is to be canceled and surrendered; and any money due for the purchase to be applied on the amount due from Bilbo, to said bank, in case of a sale of land by either party hereto.

"[Signed] Geo. W. Bilbo.<br>"D. Davenport.<br>"F. D. Ball."

The foregoing option fully lapsed on January 1, 1917. On March 24, 1917, an extension was indorsed thereon, as follows:

"In consideration of the extension to March 1, 1918, of the notes held by Iowa State Savings Bank, two in number, totaling $13,471.58, and interest and of the $500 note above referred to, the option given above to D. Davenport and F. D. Ball is hereby extended one year from the dates mentioned in the option above, all other terms contained therein being to continue in full force; and including especially the agreement that the proceeds of said land, if sold, as realized above incumbrances, should be applied on the debt due said bank; and they are hereby especially pledged and assigned for that purpose.

"The extension of option mentioned above is to extend first option to October 3d, 1917, and second to Jan. 1st, 1918.

"[Signed] Geo. W. Bilbo."

On September 29, 1917, the following contract of sale was entered into between Ball and Bilbo:

"Articles of Agreement

"Made this 29th day of September, 1917, between Geo. W. Bilbo of the first part and F. D. Ball of the second part, witnesseth:

"That the said party of the first part has this day bargained and sold to the said party of the second part the following described real estate, situated in the county of Union and state of Iowa, to wit: The southeast quarter and the east half of the southwest quarter of Section 24 in Township 72 north, Range 31 west 5th P. M. Iowa, for the sum of thirty-eight thousand four hundred dollars, one thousand dollars of which has been paid in hand, the receipt thereof is hereby acknowledged.

"Now, if the said party of the second part shall pay to the said party of the first part the several sums set forth below, and at the date set forth below, to wit, $27,400 on or before March 1, 1918, and the assuming of a first mortgage of $10,000 to P. H. Cusack due March 1, 1921, bearing 5½ per cent interest. Interest to be paid by first party to March 1, 1918, and also all other incumbrances on said land, including taxes due in 1917, with interest on all unpaid sums at the rate of 6 per cent per annum from March 1, 1918, until the whole sum is fully paid; principal and interest payable at Iowa State Savings Bank, Creston, Iowa, and shall pay all taxes which may be levied on said real estate, for the year 1917, and each year thereafter, the said party of the first part shall at his own cost and expense, execute and deliver to the said party of the second part or to his assigns, a warranty deed to the above described premises, with abstract showing good title. It is hereby especially agreed between the parties hereto that punctuality in making the payments herein provided for, promptly when due, is the essence of this contract, and that in case any payment of the principal or interest remains due or unpaid for 60 days after maturity, then this agreement, may, at the option of the first party be considered simply as a lease for the use of said premises, which he may terminate by giving ten days' written notice, retaining all moneys previously paid as rents for the use of said premises.

It is further agreed by the party of the second part, that if it becomes necessary to enforce the terms of this contract by law, a reasonable sum shall be taxed as attorney fees and added to the costs. It is also agreed by the parties hereto, that the stipulations aforesaid are to apply to and bind the heirs, executors, administrators and assigns of the respective parties.

"In witness whereof the said parties have hereunto set their hands the day and year first above written.

"[Signed] Geo. W. Bilbo.
"F. D. Ball."

On December 19, 1917, Bilbo delivered to Ball and Stream his warranty deed of the farm, with full covenants. This deed purports to have been signed November 23d, and acknowledged December 19, 1917. The foregoing comprise all the written instruments presented for our consideration.

The initial proposition put forward by the plaintiff, as appellant, is that the option contract, Exhibit P, was mutually intended by the parties as a mortgage, and that it must be construed as such. The importance of this proposition is that, unless it can be found that this particular initial instrument was mutually intended as a mortgage, then, under the record, there is no room for saying that the warranty deed subsequently issued was intended as a mortgage.

Before we proceed to a detailed discussion of particular questions, some of the difficulties confronting plaintiff may be briefly suggested. If the option contract was to be deemed a mortgage, then a mortgage upon what? Prior to acceptance by Ball, was it a mortgage upon the farm? If so, who could have foreclosed it? If the bank, what relief could it have had by foreclosure? Could the bank have compelled Ball to buy the farm at the option price, in order to enable it to apply the purchase money upon its debt? What became of the mortgage lien when the option lapsed without acceptance on January 1, 1917? Did the renewal of the option contract on March 24th create a new mortgage lien, or did it revive the old one? Could any benefit accrue to the bank under the option unless Ball elected to buy?

I. One of the issues of fact toward which evidence was

directed was the question of value of the farm. The trial court, in its decree, found that $160 per acre was the fair value of the farm at the time of the contract of sale. Because of the importance of this fact to the final merits of the case, we have given it our first consideration. The effect of this finding was to say that the testimony for the defendant on that question preponderated in credibility over the testimony for the plaintiff, whose witnesses fixed the value at $200 per acre. The record in that respect presents the usual variance of opinion among witnesses on real estate values. The corroboration of circumstances is strongly with the testimony for the defendants on this question. This land was constantly upon the market from August 3, 1916, to September 29, 1917. Various agents were busy in their efforts to sell it. It was a time of increasing prices and quickening sales of real estate. Up to the time of Ball's acceptance of the option, no purchaser had been found for it at the price. A few weeks after his acceptance of the offer, Ball sold a half interest in it to Stream, at an advance of $5.00 per acre. It was 14 months from the time Ball accepted the option before the land was sold by him and Stream for $200 an acre. The intervening period was a time of great activity in sales and increase in prices. These circumstances strongly corroborate the testimony of the defendant's witnesses as to value. As against this, the plaintiff presented one circumstance to which he testified as follows:

1. MORTGAGES: absolute deed as mortgage: adequate (?) or inadequate (?) price.

"In the latter part of 1917, I tried to sell this land. Had a customer for it in September, 1917. It was D. W. Faulkner. I told of this to Mr. Ball,—told him that Mr. Faulkner had a party that would buy this land at $225 an acre, and that he had offered me $175 an acre, and thought he could still sell it to his customer. Mr. Ball told me not to do it, and he explained that the farm was worth more money. He said I hadn't ought to sacrifice the farm at that price."

At the time the plaintiff so testified, Faulkner was dead; likewise Ball. The evidence, therefore, could not be contradicted. In such case, it is the clear duty of the court to scrutinize such evidence carefully, and to weigh its credibility. Faulk-

ner was a real estate agent. The statement on its face is not easily credible. When the plaintiff's financial circumstances at that very time are considered, it becomes still more incredible. The plaintiff owed upon this farm at that time three mortgages, the principal sums of which amounted to a sum total of $26,500, with enough accrued interest and taxes to make a total of approximately $30,000. He owned several farms, all of which were incumbered to the limit. He had in this particular farm, according to his testimony, the largest equity of any. Judgment had been entered against him in Polk County for $17,000, and another judgment had been entered against him for $3,600. Two of the mortgages upon this farm, amounting to over $18,000, were to fall due on March 1st. His debt of more than $13,000 to the Iowa State Savings Bank was to fall due on March 1st. He was indebted at one of the Creston banks for $14,000; at another, for $12,000. The great problem with him was to find purchasers for his land; and yet, according·to his testimony, he was advised by Faulkner that Faulkner had a purchaser for his farm at $225 an acre, and that, therefore, Faulkner was willing to give $175 for it. This information does not seem to have provoked any activity or inquiry on his part, except to report the matter to Ball. We are not able to say that the evidence is sufficiently consistent and credible to enable us to accept it. In our judgment, a fair consideration of the evidence in the case would warrant no other conclusion as to this particular issue than that $160 per acre was the fair and reasonable value of the land at the time of the contract of sale; and this fact will be assumed in our later discussions.

II. We take up the case of the defendant Stream. He purchased his interest from Ball on the basis of $165 an acre, without any knowledge of the alleged equities of Bilbo or that the contract was anything other than what appeared upon its face. He has pleaded that he was an innocent purchaser. The evidence undisputably shows him to have been such. But it is argued that he was a mere assignee, and therefore took subject to the equities of Bilbo, whatever they were. For the sake of the argument, let this position be accept-

2. MORTGAGES: absolute deed as mortgage: estoppel to assert secret equity.

ed, for the moment. This would mean that Bilbo would have a right to set up his alleged equity as a defense to the enforcement of the contract of sale, and that he would have a right to do so even as against Stream, as a mere assignee. But Bilbo did not avail himself of such right. He claimed no defense against performance. He did not refuse performance. On the contrary, he waived his alleged equity, and performed the contract. Not only that, but he conveyed directly to Stream an undivided one half of the land, by warranty deed with full covenants, in consideration of which Stream bound himself to Bilbo to the payment of one half of Bilbo's selling price. If it be said, therefore, that Stream, as mere assignee, was not an innocent purchaser of the contract, can it be said that he was not an innocent purchaser under the warranty deed executed by Bilbo himself? To put it in another way: Assuming that Bilbo had equities which he could have interposed as a defense to the contract, and that his right in that respect was in no manner impaired by the transfer of an interest in the contract to Stream, it does not follow that, when Bilbo came to dealing with Stream himself, he could withhold from Stream all knowledge of his alleged equities. Stream accepted the warranty deed in good faith, and in reliance thereon paid his one-half share of all the purchase price. Bilbo was not bound, under his contract, to convey to Stream. He could have performed his contract by conveying to Ball alone. Stream would have been entitled to a conveyance from Ball. He would have become thereby an innocent purchaser. Instead of advising Stream of his alleged equity, as he was bound in good morals and law to do, Bilbo conveyed directly to Stream, with full covenants. Whatever right, therefore, Bilbo had to resist performance of his contract as against Ball and his assignee, he had no equity as against Stream to resist the full obligation of his covenants of warranty. Stream, therefore, holds his title, not as a trustee, but by absolute covenants from Bilbo himself, for a stated price. On the strength of the warranty deed, Ball and Stream paid the full purchase price of $38,400. The surplus over and above the incumbrances was applied upon the indebtedness to the defendant Savings Bank. All this was done before Stream had received any intimation of any alleged equity in Bilbo.

There is a suggestion in plaintiff's pleading and an assertion in his brief here that Stream was a stockholder in the bank. This allegation is denied by the defendant, both in his pleading below and in his brief here. The assertion itself is wholly unsupported by any evidence. Even if he were a stockholder, he would not thereby be chargeable either with notice or with a trusteeship.

There is another consideration that is quite conclusive as to Stream. On the main question whether his deed was intended as a mortgage, the plaintiff testified, as sole witness. A prominent infirmity in his testimony is that it consists almost solely, as respects that question, of alleged conversations with the deceased, Ball, and of admissions made by Ball. This line of evidence was diligently objected to by the defendant Stream, as being incompetent, and as being not admissible against him, under the prohibition of Code Section 4604. It is clear that Stream must be regarded either as the assignee of Ball or else as the grantee of Bilbo, under his warranty deed. The evidence was objectionable on either theory. If Stream was the assignee of Ball, and took his title as such, he comes squarely within the terms of the statute, and was entitled to object to the testimony of Bilbo as to personal communications had between himself and Stream's assignor. On the other hand, if Stream should be regarded here as the grantee of Bilbo, then such evidence would be incompetent against him, as mere hearsay. It would be incompetent also as parol evidence offered in contradiction of the covenants of the deed. When this line of evidence is eliminated as improper, it reduces the oral evidence of plaintiff on the main question almost to a nullity.

3. WITNESSES: transactions with deceased: assignee protected.

We are clear, therefore, that Stream took a perfect title to an undivided half of the farm, and that he is in no manner subject to an accounting for the proceeds of a later sale; nor was he ever liable as a trustee, while he held the title to the land.

III. What is the basis of the liability, if any, of the Iowa State Savings Bank? It was not, in name, a party to the initial contract, Exhibit P, nor to any other instrument signed by any

of the parties. This contract, Exhibit P, provided for three things:

4. MORTGAGES: nature and essentials: involuntary mortgagee.

(1)  An option to Davenport and Ball to buy at $160 per acre.

(2)  Until acceptance of the option, an agency (not exclusive) to Davenport and Ball to sell.

(3)  That "any money due for the purchase is to be applied upon the amount due from Bilbo to said bank in case of a sale of the land by either party hereto."

The last clause here quoted was contingently beneficial to the defendant savings bank. In the event of an acceptance of the option by either Davenport or Ball, the savings bank would become entitled to receive from the purchaser, for application upon Bilbo's notes, the surplus of the purchase price over and above the incumbrances. But none of the foregoing provisions of Exhibit P ever materialized. There was no acceptance of the option; there was no sale, either by the owner or the agent; there was no money to be paid to the defendant savings bank pursuant thereto. The contract wholly lapsed on January 1st. On March 24th, it was renewed, with certain qualifications. This extension included "especially the agreement that the proceeds of said land if sold as realized above incumbrances should be applied on the debt to said bank *and they are hereby especially pledged and assigned for that purpose.*"

Again, the bank became contingently benefited by the latter provision. In the event of an acceptance of the option, either by Ball or by Davenport, the bank would become entitled to have the surplus of purchase money applied upon the indebtedness of Bilbo. Ball did later accept the option, and the bank did become entitled to receive such surplus of purchase money, and did receive the same. Did such provision in this personal contract between Ball and Bilbo make the bank a mortgagee of the farm? It is not unusual, in a contract of purchase and sale between two parties, to provide therein that the purchase money, or some part thereof, be paid to a third party. Such provision, when mature, may be enforced by such third party, as against the promisor. He does not thereby supplant either party to the contract. It may be assumed that such a provision

often operates as a security to such third party, if he be a creditor of the party for whose benefit the money is thus paid. But it has never been held that the benefit thus conferred upon a third party makes him a trustee, or that it gives him a lien upon the subject of the sale or any control thereof. The control of the subject-matter of the sale remains with the parties to the contract, and is not affected by such a provision. Suppose, for instance, that this land had been sold to a stranger, either with or without the agency of Ball, and that a contract of sale to the stranger should provide that the purchaser should assume the incumbrances, and should pay the balance of the purchase price to the Iowa State Savings Bank, would it be claimed that such a provision made the bank a trustee or a mortgagee of the property? Doubtless not. But at this point, the argument for appellant is that Ball and the savings bank were the same identity, and that Ball was simply acting as agent for the bank, and acting as such in his own name; that his agreement to buy was the bank's agreement to buy; that his agreement to pay the purchase money to the bank was the bank's agreement to pay the purchase money to itself. But this is quite begging the question. All these contracts herein set forth purport to be strictly personal between the parties named therein. Davenport can be eliminated from consideration; for, though he was an optionee, he abandoned the option on his part, and never assumed to purchase or to control the property. Ball purported to accept in his own behalf. Without doubt, he became thereby personally bound to the payment of the purchase price. The contract of sale purported to be with him personally, and the warranty deed ran to him in like manner. The bank never assumed any responsibility in the purchase. It never claimed any benefit therefrom, and never assumed any liability therefor. If Ball had assumed to bind the bank to a purchase of this farm at $160 per acre, it was not within his power, as a cashier, to do so without the action of his board of directors. It was competent for Ball to act in his personal capacity. He violated no duty toward the bank, in making this purchase. The bank's relation to the transaction is no different from what it would have been if the purchaser had been an entire stranger. The right of the bank was

defined by the clause which we have quoted from the option contract. The claim that a mortgage was mutually intended must rest upon that clause. Unless such clause can be construed as an equivalent of a mortgage to the beneficiary of it, then the plaintiff has no standing as against the defendant bank. Even if the deed delivered to Ball for an undivided one half was intended by Ball and Bilbo as a deed of trust and the equivalent of a mortgage to secure the bank, even then, *Ball* was the grantee in the deed, and was necessarily the trustee, if trust there was. In any event, the bank was not a trustee. It had received nothing. It had control of nothing. It had no enforcible right under the option contract until Ball had exercised the option. Upon such exercise and upon the acceptance of a deed by Ball, he became, by the very terms of his contract, bound to pay to the savings bank all the purchase price, less the amount of the incumbrances. He became personally a debtor to the savings bank in such amount. This obligation attached to him instanter when the purchase of the farm was completed, and it was not conditioned upon his making a future sale of the farm. He was liable to the savings bank for the amount of his undertaking, regardless of whether he could ever reimburse himself by a resale. Suppose the plaintiff had brought this action to establish his interest in the title while Ball still held the title, would he have brought this suit against the savings bank, as the alleged trustee, or would he have brought it against Ball? Could he have obtained any relief as against the savings bank, without impleading Ball and adjudicating Ball's rights under the contract entered into between him and Ball? If he could not have done so while Ball still held the title, is the liability of Ball any less or that of the savings bank any greater because Ball wrongfully disposed of the property, if wrongful it was? And yet that is the very position which the plaintiff assumed in attempting now to enforce against the savings bank the obligations undertaken by Ball in his contract, whereby he bound himself, not only to the plaintiff, but to the savings bank as well.

IV. As bearing upon the liability of the Iowa State Savings Bank for the alleged conversion of the property, there is another circumstance which throws significant light upon plain-

tiff's own conception of the bank's relation to the transaction. In his original petition, filed in April, 1919, the plaintiff declared against Ball and Stream as his trustees, and asked that he recover from them the value of the farm alleged to have been converted by them as trustees. He prayed also as follows:

"That the moneys coming into the hands of either of said defendants be applied first on the debt by plaintiff to the Iowa State Savings Bank, and the balance to be held to be the property of plaintiff; that, after the payment of said debt, the said bank be compelled to turn over to plaintiff the mortgage of $28,000 held by said bank as collateral security for the loan made to plaintiff; that an accounting be had between the plaintiff and the defendants, and on that account being rendered, that plaintiff have judgment against the *defendants F. D. Ball and Frank L. Stream* for the balance of the money arising from the rent of said land and the price received by said defendants for the sale of said land, after paying the debt due from plaintiff to the defendant bank."

There was no claim in the original petition that the bank was liable for the conversion of the property or for the profits made in the resale thereof. The bank appears to have been made a party defendant solely for the purpose of an accounting for the moneys received and to be received by it from Ball and Stream, and for a surrender of the other security. Some months later, plaintiff filed an amendment, wherein he charged the acts of Ball in the execution of the various instruments to be the acts of the Iowa State Savings Bank, and asked that the said bank be required to account for the conversion of the farm. It is evident that, up to the time of the filing of his original petition, the plaintiff understood and believed that the bank sustained no other relation to the various writings executed than as beneficiary, according to their terms. This circumstance is by no means conclusive upon the plaintiff, but in the light of the evidence in the record, it is a substantial circumstance to be considered against him.

V. Up to this point in the discussion, we have assumed that the sale to Ball was something less than absolute, and that he stood in the attitude of a trustee. In view of the fact that Ball

**5. EVIDENCE:**
**parol as af-**
**fecting writings:**
**absolute contract**
**as conditional**
**contract.**

is not a party to the action, it is not strictly necessary that we determine his status, so far as his right would have been concerned. But to avoid possible misunderstanding as to this feature of the case, we ought, perhaps, at this point to withdraw the assumption. Taking the most favorable view of the plaintiff's oral evidence, the conveyance in question was made to Ball for a purpose. It was never contemplated by the plaintiff that Ball should reconvey to him. He had no expectation of ever redeeming the land from the incumbrances against it, except by a sale thereof at a fair value. Taking his testimony for it, he expected Ball to sell to the best possible advantage, and to use the full proceeds of the resale for his benefit, and to account to him therefor. That is to say, the real consideration for the deed was to be, not $160 per acre, but the resale price for which Ball might sell the property. According to the fair purport of his own testimony, Ball perpetrated no wrong in disposing of the property. That was mutually contemplated. The wrong charged against Ball is that he withheld a part of the resale price and had converted the same to his own use. This was the direct charge of the original petition filed in this case. If it were permissible to the plaintiff to show by parol evidence this departure from the written contract, he does not thereby establish the transaction as a mortgage. It is competent for parties to an absolute sale to stipulate that the consideration for the sale shall be the amount which the purchaser may receive for the property upon a resale. The character of the conveyance as an absolute sale is not affected by such an arrangement. Such was the consideration in *Doolittle v. Murray & Co.,* 134 Iowa 536, wherein it was held that the contract was one of absolute sale, nevertheless. Such also was the contract under consideration in *Bradford v. Helsell,* 150 Iowa 732. The rule of evidence that a written contract may not be contradicted or varied by parol evidence is not abolished in this class of cases. The rule invoked herein in its primary form is that a deed absolute on its face may be shown by parol evidence to have been mutually intended as a mortgage, provided that the evidence is clear and satisfactory to that end. This rule may be regarded as in the nature of an exception to the parol-evidence rule, or

its consistency therewith may be maintained in argument, as it often is, on the theory that a deed is unilateral; that it is the performance and consummation of an antecedent contract; that it implies an antecedent contract which is not incorporated therein; and that, therefore, such contract may be inquired into for the purpose of construing the character of the deed. This opens the door to the proof of such prior contract, whether it be written or oral. If oral, it is necessarily proved by parol evidence; if in writing, *it is proved by the writing*. Whereas it is true, therefore, that a deed absolute on its face may be by parol evidence explained as a mortgage, it is not true that the same rule applies to a *written contract* between the parties. Where such written contract purports to state the mutual undertakings of the parties thereto, it cannot, in the absence of fraud, mistake, or ambiguity, be contradicted or varied by parol evidence. If, by the express terms of the written contract, an absolute sale of property is disclosed, parol evidence is not admissible to show that the intent of the parties was something else. This question was fully considered in *Bigler v. Jack,* 114 Iowa 667; again in *Doolittle v. Murray & Co.,* 134 Iowa 536; and again in *McGuire v. Halloran,* 182 Iowa 209. From the *Doolittle* case we quote:

"It is also well established that a deed purporting to transfer or convey title to property may be shown by parol to have been given and received as a mortgage, whether the action be in equity or at law. *McAnnulty v. Seick,* 59 Iowa 586; *Frick v. Kabaker,* 116 Iowa 502. This rule is not altogether an exception engrafted upon the former; because, ordinarily speaking, a deed is not evidence of the contract between the parties, but is rather the consummation of a contract resting in parol or in another writing. *Trayer v. Reeder,* 45 Iowa 272; *Saville v. Chalmers,* 76 Iowa 325; *Bever v. Bever,* 144 Ind. 162 (41 N. E. 944); *Davis v. Hopkins,* 18 Colo. 153 (32 Pac. 70). But where any inconsistency is found between the terms of the preliminary contract and the deed which witnesses the consummation of the transaction, the latter will prevail. *Philbrook v. Emswiler,* 92 Ind. 590; *Cole v. Gray,* 139 Ind. 396 (38 N. E. 856). It may be further conceded that the purpose for which a writing was delivered may generally be shown by parol; but this is subject to

the restriction that the purpose thus shown must not be in contradiction of the express terms of such writing. *Courtwright v. Strickler,* 37 Iowa 382; *Dickson v. Harris,* 60 Iowa 727; *Blair v. Buttolph,* 72 Iowa 31; *De Goey v. Van Wyk,* 97 Iowa 492. These rules have been most frequently applied to conveyances of real estate, but have sometimes been invoked in the consideration of bills of sale of personal property. *Voorhies v. Hennesy,* 7 Wash. 243 (34 Pac. 931); *Seavey v. Walker,* 108 Ind. 78 (9 N. E. 347); *Frick v. Kabaker,* supra. But, where the writing is something more than a formal transfer of title, is executed by both parties, and contains mutual stipulations and provisions which they specifically undertake to observe, it is held, with very general unanimity, that parol evidence is not admissible.''

In the case at bar, all the writings in the record unequivocally disclose an absolute sale at a fixed price. If the contrary is to be found, it must be found upon parol evidence, in contradiction to the writings. The option granted to Ball was an option to *purchase* at $160 per acre. The price was fair. It was the desire of the plaintiff to sell his property, if he could obtain a fair price, and it was greatly to his interest so to do. The rule under consideration is a rule of evidence only. Though equitable considerations enter into it, it is not intended to impose disability upon debtors and creditors, as parties to a contract. It is not legally impossible even for a mortgagee, in lieu of a foreclosure, to purchase the fee from his debtor, provided that purchase and sale be the real intent of the parties. *McMahon v. Gotch,* 191 Iowa 1. True, equity will scrutinize such a contract, and if it is found unconscionable, another door of inquiry will be opened thereby.

Upon the record before us, the writings must be deemed to speak according to their express terms. We see no standing room therein for the plaintiff as against Ball, if he were a party hereto. Much less has he any room to stand as against the Iowa State Savings Bank, as the alleged principal of Ball.

VI. There are circumstances which are quite incidental, and yet which throw considerable light upon the real intention of the parties. The burden is upon the plaintiff to show that

the mutual intent of himself and Ball was to create a mortgage lien, and no more. The plaintiff's contract of sale called for perform-ance on the first day of March, 1918. It was, in fact, performed on December 19, 1917, in advance of the specified time. The plaintiff testified to the reasons for this acceleration of perform-ance, to the effect that judgments had been entered against him in distant counties and were about to be transcripted to the home county, and that these would thereby become liens, which would becloud the title and make performance more difficult. Immediate conveyance was, therefore, made, in order to avoid such cloud of title. If the deed was intended only as a mort-gage, then the equitable ownership still remained in Bilbo, and the judgment liens thus sought to be avoided would become liens, nevertheless. A successful avoidance could only be had by concealing from other creditors the real nature of the convey-ance. This would amount to a fraud upon other creditors. We cannot readily presume that Bilbo and Ball intended to make a fraudulent cover for Bilbo's property. But we are faced with one alternative or the other. They accelerated the performance in order to save the property from the expectant liens of other creditors. They could not thus avoid, except by a bona-fide absolute conveyance of the property. This circumstance alone is well nigh, if not altogether, conclusive against the present contention of the plaintiff.

*6. JUDGMENT: lien: equitable interest.*

VII. In view of the fact that Ball did pay the remnant of the purchase price into the hands of the savings bank, the plain-tiff is doubtless entitled to know how much was so paid. His petition prays for an accounting. We think it sufficient to say here that he did, in fact, receive an accounting at the trial. He called the cashier of the savings bank as a witness, and ex-amined him fully. The books of the bank were brought into court, and full disclosure made. The amount paid in by Ball was the amount of the purchase price at $160 per acre, over and above the incumbrances. This amount was credited by the bank upon the notes of the plaintiff. No occasion is left for any de-cree ordering an accounting.

It is charged also in the petition that a usurious contract was exacted at the time of the original transaction, in that Ball

and Davenport exacted a commission of $500. This alleged con-

7. CONTRACTS:
legality:
usurious pro-
vision.

tract is a part of Exhibit P, already set forth. It was a stipulation for a commission. The stipulation is somewhat ambiguous and uncertain in meaning. It might be construed as a contract for a commission for selling land, as agents, or as a commission for procuring the $7,000 loan. As a commission for the sale of land, it was legitimate. As a commission for procuring a loan, it was legitimate as regards Davenport, at least, who was engaged in the loan business on his own account. Moreover, the provision for a commission was conditional and contingent. It was not to be effective in the event that the option was accepted. The option having been accepted, it became wholly nugatory; and it became so pursuant to the original stipulation therefor. The provision could fairly be construed as providing for a commission for a sale of the real estate, in the event that the option was not exercised. This is consistent with the provision that it should not apply if the option were exercised. Inasmuch as the provision is capable of an innocent construction, we would not be justified in forcing upon it a construction that rendered the contract unlawful.

It is our conclusion that the trial court properly dismissed plaintiff's petition, and its judgment is, accordingly,—*Affirmed.*

STEVENS, C. J., PRESTON and FAVILLE, JJ., concur.

WEAVER, ARTHUR, and DE GRAFF, JJ., dissent.

DE GRAFF, J. (dissenting). The plaintiff Bilbo was desirous of borrowing money and on August 3, 1916 he went to the abstract and loan office of D. Davenport at Creston, Iowa to secure a loan of $7,000 to finance the purchase of a large tract of Wyoming land. Mr. Davenport told him "that he did not have any money of his own to invest, but he would go over to the bank [appellee State Savings of which he was president] and see what he could do." At that time plaintiff was indebted to the bank on an unsecured note in the sum of $6,471.58.

As a result of further negotiations with the president and Cashier Ball of said bank an option contract was entered into August 3, 1916 between Bilbo and the officers of the bank, but

the agreement was executed in their individual names and without reference to their official positions. One paragraph of the written option reads as follows: ''That in consideration of the second parties (Davenport and Ball) furnishing or causing to be furnished to Geo. W. Bilbo the sum of seven thousand dollars in cash to carry through a certain trade for land in Sweetwater County, Wyo., involving about 14,000 acres of land, the first party agrees'' etc.

Bilbo further agreed to secure the loan by a first mortgage on the Wyoming land, ''together with the amount now due said bank, same to be payable March 1, 1917.'' Another paragraph of this contract provided that Davenport and Ball had an option, good at any time up to and including the 3d day of October 1916, to purchase from Bilbo a 240-acre tract of land owned by him and situated in Union County, Iowa at a price of $160 per acre, settlement to be made March 1, 1917. It was also provided that Bilbo had the privilege on and after October 3, 1916 to sell the said Iowa land, ''it being contemplated that either party may make sale and in case sale is made by either the other party is to be notified thereof within twenty-four hours.''

The appellee bank furnished the money to Bilbo under the terms of this contract, and plaintiff signed and delivered to the bank his notes representing the unsecured loan and the advance loan of $7,000 and also executed the mortgage on the Wyoming land. Nothing was left undone except the executory provisions of the contract.

On January 1, 1917 plaintiff's Iowa farm remained unsold and all option rights expired by time limitation, and the contract in its entirety terminated.

On March 24, 1917 upon request of the bank, and in consideration of the extension to March 1, 1918 of the payment of the Bilbo notes held by the bank the option given to Davenport and Ball was extended one year from date thereof, and all the terms of the original contract were to remain in full force. By the terms of the renewed option Davenport and Ball should have the right to purchase the Iowa farm until October 3, 1917, and plaintiff should have the concurrent right to sell the land from the latter date to January 1, 1918, when the option contract would again expire.

Subsequently and on September 20, 1917 a contract of sale signed by plaintiff and F. D. Ball was executed whereby plaintiff "bargained and sold" the Iowa farm to Ball for a consideration of $38,400 of which $1,000 was paid and receipt acknowledged. This initial payment was credited on plaintiff's first note to the bank.

On October 13, 1917 a one-half interest in this land contract was assigned by Ball without the knowledge of plaintiff or the express consent of Davenport to defendant Frank L. Stream at $165 per acre.

On December 19, 1917 plaintiff and his wife conveyed by warranty deed to Ball and Stream the land described in the contract of sale. At this time plaintiff was being hard pressed by creditors and judgments had been entered against him in courts of adjoining counties. On Ball's insistence this deed was executed in order to prevent liens attaching on the farm through transcripts of judgments to the county where the land was situated.

On March 1, 1918 possession of the real estate in question was taken by Ball and Stream who rented the land on a crop basis for the year receiving in value $3,029.25.

Ball and Stream sold the land in question to Judson Walker at $200 per acre, and later Walker sold the land at $205 per acre. Although the deed was executed by Bilbo on December 19, 1917 it bears date November 23, 1917. Bilbo's notes were not at that time canceled and paid. Why not, if an actual sale was intended and accomplished? The notes themselves are marked paid "November 21, 18 as of September 1-18." It is further shown that this land was sold to Walker in November 1918 and it was only after that sale that any money was applied on the debts of plaintiff to the appellee bank. The record is not clear or explicit as to what disposition was made of the proceeds of the sale in full nor does it show how much of the proceeds of the sale was received by the bank. It is shown that Ball and Stream each held a mortgage of $12,500 on the Iowa farm, presumably given by the purchaser thereof.

Prior to the trial of this cause the cashier Ball died and the administratrix not having been substituted trial proceeded as against the other defendants. By the death of Mr. Ball the

action abated as to him. In passing it may be said that defendant Stream is not a necessary party defendant.

The answer of the defendant State Savings Bank admits that plaintiff on August 3, 1916 applied for a loan from the appellee bank, admits making the loan, and "giving the security demanded by said bank, with the cashier and the president of said bank."

The primary and controlling question presented by this appeal involves the nature and character of the initial contract between the parties thereto. All subsequent agreements pursuant thereto must be construed in the light of the initial agreement. If the first contract coexistent and concurrent with the Wyoming mortgage was also conceived as a mortgage, and when born was a mortgage, the subsequent contract of sale and deed being dependent thereon and made in pursuance thereof can take no other form or color than the original instrument. This is a rule of presumptive evidence and not of substantive law. As was said in *Newman v. Samuels,* 17 Iowa 528; "If a transaction resolve itself into a security, whatever may be its form, and whatever name the parties may choose to give it, it is *in equity a mortgage.*" Both Bilbo and President Davenport testify· that the option contract was given as a security and the defendant bank in answer admits expressly the contract of option was "given as security." This being the practical and agreed construction, what authority has any court to give it any other meaning or construction? Furthermore Bilbo never dealt with Ball and Davenport as individuals and the bank does not so contend. They acted as officials and agents of the bank when the money was loaned and continued to be. There is no evidence or presumption to the contrary.

Primarily it is a question of intent, and this intent must be found in the nature of the transaction and what was said and done at the time and immediately prior to its execution. If the transaction in question is, in substance, a loan of money upon the security of the farm, a court of equity is bound to look through the forms in which the contrivance of the lender has enveloped it, and declare the instrument to be a mortgage.

"The fundamental principle of equity is, that whenever a conveyance of land is given for the purpose of securing pay-

ment of an existing debt, it is a mortgage. If the fact is established that a debt exists between the parties, and the transaction did not amount to a present payment, satisfaction, or discharge of that debt, but recognized it as still continuing, to be paid at some future time, and was intended to be a security for such payment, then the instrument is always regarded in equity as a mortgage, whatever be its form.'' 3 Pomeroy on Equity Jurisprudence (4th Ed.), Section 1192.

An equitable mortgage is an instrument of conveyance in legal effect a mortgage, but cognizable as such only in a court of equity. It is well established that an agreement in writing to give a mortgage, or a mortgage imperfectly or defectively executed, or an agreement to appropriate specific property to the discharge of a particular debt, or a deed or bond intended to be a mortgage creates an equitable mortgage. This doctrine is based on the maxim that equity regards that as done which ought to be done.

The form of the instrument is not conclusive against either party. There is no magic in the words used. When, however, the plain intent of the contract is disclosed, not only by the instrument itself, but by the surrounding facts and circumstances, equity will not by legal legerdemain give words a meaning contrary to the expressed and plain intent. See *Fort v. Colby*, 165 Iowa 95; *In re Assignment of Snyder*, 138 Iowa 553 (19 L. R. A. [N. S.] 206); *Cullen v. Butterfield*, 178 Iowa 621.

The option contract in the instant case is not self-executing. It required a *novus actus* on the part of plaintiff, and this act is evidenced by the contract of sale preliminary to the execution of the deed.

This is not a case where there was no previous debt, no loan in contemplation, no stipulation for the repayment of the money advanced, no proposition for or conversations about a mortgage. Plaintiff himself testified: ''They [Davenport and Ball] finally agreed; one of them, I forget which one of them, said, they would make me that loan of $7,000 to take up my check that was already out and secure the $6,000 that I owed the bank, if I would give them the Bunzendahl place as security in addition to the 14,000 acres of Wyoming land, which I agreed to do.''

He further testified: ''There was said about the Bunzen-

dahl farm this: I told them I would give them a fourth mortgage on the Bunzendahl farm; there were three mortgages on the farm then (amounting to $26,500). The conversation was: 'The bank can't take a fourth mortgage. We will let you have the $7,000 provided you give us, pledge your interest in, the Bunzendahl place, as additional security besides the 14,000 acres of Wyoming land.' Mr. Ball said he would prepare a writing. I told him I would do it; I had nothing else to do.''

Prior to the execution of the contract of sale a conversation was had relative to the land contract between plaintiff and Ball. Plaintiff testified: ''Mr. Ball came to me, prepared a land contract, and told me I must execute to him a land contract for this land. I protested. He told me that he wanted to be sure and get protected for what I owed the bank, and he was going to ask me to make a land contract so he could go ahead and sell it. At that time I was having trouble. I was sued in Des Moines, and they got a judgment against me for $17,000. I was also sued at Osceola, and they were procuring a judgment against me. Mr. Ball told me that, if I did sign the contract, he was going to proceed to collect those three notes. Mr. Ball came to me and said my attorney had told him that they had rendered judgment against me that day at Osceola and they would transcript it up here, and that the judgment would come in ahead of the security that the bank held; that they held for what I owed the bank the Bunzendahl place, and he was going to ask me and my wife to come up to the bank and make a deed for the property. My wife and I signed the deed to him. It was late, and I had the recorder stay down there until 6 o'clock to record it. It was signed the very day we got home from the trial at Osceola.''

It is very important, since the lips of Mr. Ball are forever closed, to understand Mr. Davenport's version of this transaction. His testimony in part is as follows: ''When I first saw Exhibit P [the initial contract], Mr. Ball brought it to me some time in the forenoon. He came down and told me what Mr. Bilbo was proposing, and asked me what I thought of it, and I consented to the statement that he made. I signed it. I knew the money Bilbo was to get was a loan from the bank. Q. And he was also to secure the sum which he owed the bank?

A. Yes; whatever is set out in here [Exhibit P]. Q. But let me ask you, all your dealing with that land was to secure the bank, was it not? A. Well, that was one of the objects of our getting the Bunzendahl land. Q. Do you understand Mr. Davenport that, at the time the bank was loaning Bilbo the money that you and the cashier were taking in the same instrument, an option whereby you could sell the land at $160 an acre, or buy the land, and all you got over that belonged to you and Ball personally? Is that your conception of the contract when you signed it? A. I understood we had a right to take it under this contract. Q. And as a banker you believe you had a right to do that? A. I just took this contract as it was, I signed it and consented to it. Q. And you believe, as the president of the bank, that you had a right to make that deal whereby you and the cashier would profit personally from that transaction? Is that it? A. No; we were not expecting any profit. Q. But in case the land sold for $200.? A. Well, I didn't take that into consideration. Q. All you took into consideration was you had a chance to sell the land for $160, to pay the bank, wasn't that it? A. That was the object of this; yes, sir. I didn't take into consideration who would get the difference if the land sold for more than $160 an acre. We didn't expect to do that. The contract [Exhibit P] ran to me and Ball. I was president and he was cashier of the bank. That is all we expected to get out of it was to secure the bank for what we were going to loan Bilbo and what he already owed us. I heard that Bilbo was deeply involved financially. Ball told me that we were to get an option on that land to buy it or sell it, and I understood we were securing these other claims. I don't know anything about the extension written on the contract. I didn't assign away any right that I had in Exhibit P. I didn't care to do it." This is the bank's own interpretation of the contract in question through its president. It is the equitable and true construction.

It is suggested by appellee that a court must view the deed as a deed of trust. In other words that there was a conveyance to a person other than a creditor with power to sell and apply the proceeds on the debt of the creditor. A deed of trust under such circumstances is considered nothing more than a lien. A mortgage is but a lien. Under our statute the mortgagor retains

the legal title and the right of possession. Section 2922 Code 1897. A deed of trust "shall be considered as, and foreclosed like, mortgages." Code Sections 4284 and 4287. See also *Newman v. Samuels,* supra.

It must be admitted under the evidence, and it is admitted by the answer of the appellee bank that the bank made this loan, that it took security for past due debts and for an additional loan, and that it was the party in whose favor and for whose benefit the lien was created. There is no escape from this position. May it be contended that the bank could have successfully sued to collect the two notes before their due date? Upon what, then, may the contention of appellees rest that the initial contract gave to Ball and Davenport the right to sell the land or to buy the land within the stipulated period and to make a personal gain thereby when the notes were not due and payable until seven months from the date of the instrument? If the mortgage character attaches at the commencement of a transaction so that the instrument, whatever its form, is regarded in equity as a mortgage that character must and will always continue. Courts of equity have never recognized the clogging of the equity of redemption.

An equitable mortgage possesses an implied defeasance clause, and equity permits a verbal defeasance to be proved and read into the instrument. The relation of debtor and creditor did not exist between plaintiff and defendant Ball or his official associate, Davenport. It did exist between plaintiff and appellee bank. The answer to a few pertinent questions may clarify this record.

Who made this loan? The bank. Who approved the loan? The cashier and president of the bank. Did any consideration pass between Davenport and Ball as individuals and plaintiff? No; unless it may be said that the former caused the money "to be furnished," but this was caused by their official act. Was the option contract entered into by reason of any personal gain or with the thought of a private contract on the part of Ball or Davenport? No; and Mr. Davenport so states. The transaction resolves itself into a security, and all of the surrounding circumstances sustain this view. The conversations leading up to the making of the contract contemplate the giving of a security.

If the option contract was intended in the first instance as a mortgage, when did it cease to be such? The contract of sale was dependent upon it and was made in pursuance thereof. The form and terms adopted by the instruments were a veil to a transaction differing in reality from the appearance those instruments assume. The bank itself could not engage in the purchase and sale of real estate, but it did permit a contract to be made in the name of its president and cashier as individuals. By this contract Ball and Davenport became trustees for the bank and obligated themselves as such in the event of sale of the land to apply the proceeds thereof to the payment of the indebtedness owing by the plaintiff to the bank, and to the liquidation of any indebtedness secured by other liens on the land then payable, and to turn the balance, if any, to the equitable title holder. This is the defeasance clause which equity reads into the instrument.

We are not denying the right and power of two or more competent persons to make an option contract for the purchase and sale of land, as that would transfer to a court of equity in a large degree the guardianship of adults as well as of infants. But equity will watch vigilantly any exercise of skill on the part of the scrivener when a suspicion arises, lest that should be made effectual which equity forbids.

The contracts and deed were not quite voluntary on plaintiff's part, and there were necessitous circumstances known to the adverse parties which must be taken into consideration in determining doubtful cases. Plaintiff was heavily indebted. The Iowa farm had three mortgages thereon, and when a fourth was tendered the bank it was refused. The option contract was then evolved to give the bank additional security. This was the plain intent. It may be said, furthermore, that the consideration named in the contract of purchase was not adequate and proportionate to the true value of the land at the time of sale. This is not a controlling consideration, but a circumstance which a court may consider.

Plaintiff's claim should find favor under the benign doctrine of equity jurisprudence. The option contract around which this case gravitates is a security for the loan made. It would be inequitable for the purchasers, who were in the eyes of

equity quasi trustees or mortgagees, to reap a personal advantage by virtue of giving to certain instruments a meaning that was not intended in their creation. The appellee bank is the real party in interest.

This action is strictly one for an accounting. We are not concerned with the *bona fides* of Stream's erstwhile title. He ceased to be even an assignee before the commencement of this action. The same results would obtain if Stream were not a party to this action, and if he had demurred, his position would have been well taken. His *bona fides* is no more involved than the good faith of the grantee Walker or his subsequent grantee. Whatever the interests of Mr. Stream may be in relation to the real party in interest (the appellee bank) can be determined by the lower court upon the retrial and decreed accordingly.

The appellant is entitled to an accounting. I would reverse.

WEAVER and ARTHUR, JJ., join in the dissent.